E. L. HARDING, Appellant, v. BOARD OF SUPERVISORS OF OSCEOLA COUNTY et al., Appellees.

No. 40971.

JUNE 20, 1931.

REHEARING DENIED DECEMBER 15, 1931.

W. L. Harding and R. A. Oliver, for appellant.

Geo. E. Gill, for appellees.

E. H. Koopman and I. R. Meltzer, for interveners and appellees.

WAGNER, J.—The plaintiff, in his petition, alleges that he is a resident, citizen, and real estate owner and taxpayer of Osceola County, and has been for many years last past; that he brings this action for and on behalf of himself and numerous other residents, citizens, real estate owners, and taxpayers of said county, who have like interest in said cause. The defendants constitute the Board of Supervisors, the County Auditor and County Treasurer of said county. The plaintiff asks that the defendant-officers be enjoined from issuing primary road bonds in the sum of $800,000.00 authorized by the voters of Osceola County at the general election held on November 4, 1930. The grounds upon which he asks that an injunction be issued are: (1) that, subsequent to the election, the State Highway

Commission materially changed and relocated Primary Road No. 9, and that the defendants are wrongfully proposing to use said bond issue to pave said relocated road, and that said action would constitute a wrongful diversion of said funds; and (2) that said bond issue is illegal and void because of the inadequacy of the provisions for paying the interest and principal of said bonds. The defendants deny the allegations which the plaintiff alleges entitle him to an injunction, and certain parties have intervened, joining the defendants in the action. The plaintiff alleges in his petition, and the defendants and interveners admit in their answer, that the primary road system of Osceola County was established under Chapter 237 of the Acts of the 38th G. A.; that up to and including the time of the matters complained of, the following roads constituted the primary road system of Osceola County, to wit:

"Primary Road No. 21, crossing said County from south to north about eleven miles east of the west line of said County.

"Primary Road No. 9, crossing said County from east to west as follows, to wit: Beginning on the east line of said County at the intersection of the south line of Section Twenty-four (24) of Fairview Township; thence west two miles; thence south one mile on the east line of Section Twenty-seven (27) of Fairview Township; thence west five miles to the northeast corner of Section Thirty-five (35), in Horton Township; thence south one mile along the east line of said Section; thence west one half mile along the south line of said Section; thence south through the town of Ocheyedan two miles to a point on the center of the north line of Section Fourteen (14) of Ocheyedan Township; thence west about sixteen and one half miles on the section line through Sibley, the county seat of said County, to the west line of Osceola County."

No. 9, hereinbefore described, ran through the towns of Harris, Ocheyedan and Sibley. The fair inferences from the record are that in the summer of 1930, the State Highway Commission relocated, or contemplated relocating, that portion of No. 9 beginning on the east line of the county at the southeast corner of Section 24, in Fairview Township, and terminating at the southeast corner of Section 35, in Horton Township, by substituting therefor the following: Beginning at the southeast

corner of Section 36, in Fairview Township, and running straight west to the southeast corner of Section 35, in Horton Township, and by putting in a stub or spur leading thereto from the town of Harris, and that the grading, or a major portion thereof, upon the substituted portion of said road was completed before the general election in 1930. It will be observed that, at the time of said election, no change as to designation or location of the remainder of No. 9 had been made. At the general election in November, 1930, there was submitted to the voters of said County the following proposition:

"Shall the Board of Supervisors be authorized to issue bonds from year to year, in the aggregate amount not exceeding eight hundred thousand dollars, *for the purpose of providing the funds for draining, grading and hard surfacing the primary roads of the county,* and to levy a tax on all property in the county from year to year not exceeding five mills in any one year, for the payment of the principal and interest of said bonds, provided, however, that the annual allotments to the county of the primary road fund shall be used to pay interest and retire said bonds as they mature, and only such portion of said tax shall be levied, from year to year as may be necessary to meet any deficiency, if any, between the amount of the interest and principal of the bonds and the said allotments from the primary road funds?" (Writer's italics.)

Said proposition carried by a vote of 1,400 in favor of, to 905 against, the proposition. Shortly after the election, surveys were started by the Commission on proposed Primary 33, leading from the south side of the County, through Ashton to Sibley, and also upon what we shall term New No. 9, leading from the center of the south line of Section 35, in Horton Township, thence west to the east side of the C., St. P., M. & O. R. R., thence southwesterly along the east side of said railroad and substantially parallel therewith to the city of Sibley, and by putting in a spur leading from said east and west road to the town of Ocheyedan. On February 3d the Highway Commission sent for signature to the Board of Supervisors a proposed contract, by which it was proposed to pave Primary Road No. 9 from the Dickinson County line on the east, to the Lyon County line on the west, "a distance of approximately 26 miles." This

contract was not signed by the Board of Supervisors. On February 18th a resolution was passed by the Highway Commission and communicated to the Board of Supervisors, requesting the issuance of bonds to pay for the paving on Primary Road No. 9 from Sibley to the Dickinson County line. On March 2d a proposed new contract was forwarded by the State Highway Commission to the Board of Supervisors for signature. In this latter contract, the Highway Commission, for the first time, disclosed its purpose to use the proceeds of the bonds to pave what we have hereinbefore termed new No. 9 between Ocheyedan and Sibley, two miles north of where No. 9 was located at the time of the election. Said contract contains the following provision:

"Whereas the Iowa State Highway Commission now proposes to pave Primary Road No. 9 from a point on the Osceola-Dickinson County line, near the S. E. corner of Section 36, Township 100 North, Range 39 West, thence west, substantially following the section line to the east side of the C., St. P., M. & O. R. R., near the south quarter corner of Section 31, Township 100 North, Range 41 West, thence southwesterly along the east side of said railroad and substantially parallel thereto to the north corporation line of the City of Sibley, a distance of approximately 20 miles."

It appears that the Board at first refused to sign this proposed contract, but after mandamus proceedings had been begun,—or threatened,—the Board did sign the same. The contract calls for the issuance of bonds in the amount of $600,000.00 for said contemplated improvement. A stay order has been issued by this court to maintain the status quo until the determination of this appeal.

The situation as to the primary roads of the county is shown by the accompanying map. No. 21 and what we shall term old No. 9 are shown by the black lines, and designated respectively by the figures 21 and 9. What is now contemplated by the State Highway Commission as No. 9 is designated by the segmented lines.

As we proceed, it must be borne in mind, as hereinbefore stated, that it is inferable from the record that that portion of the segmented line extending from the Dickinson County line to a point on the south line in the center of Section 35 north of the town of Ocheyedan had been substituted for old No. 9, leading from the southeast corner of Section 24, in Fairview

Township, to said point. It will thus be observed that new No. 9, which the State Highway Commission now proposes to pave, contains approximately 12 miles which in no event constituted a part of the primary roads of said county at the time of the election. Ten miles of said contemplated new primary road was a highway at that time, and lies two miles north of old No. 9, the primary road at the time of the election. The approximately two miles lying on the east side of the railroad to the north of Sibley is a highway established by the State Highway Commission.

The appellant contends that the voters gave their authority for the issuance of bonds for the purpose of providing funds for the improvement of only such roads as were the primary roads at the time of the election, and that to permit the use of the money thus to be raised by the issuance of bonds for the improvement of the highway mentioned in the aforesaid contract, which highway was not designated as, and did not constitute a part of, the primary roads at that time, would constitute a wrongful diversion of the funds. The appellees contend that the State Highway Commission are authorized by the law to relocate and make a new designation of the primary roads and to designate any substituted road as a primary road, even after the election, and that, therefore, there has not been and is not now any threatened diversion of the funds to be raised by the issuance of the bonds. This constitutes the main issue between the parties.

The proceeds of the bonds may be used only for the particular purpose authorized by the voters. The use of the same for any other purpose would constitute an unlawful and wrongful diversion of the funds. See 44 C. J. 1209; Tukey v. City of Omaha (Neb.), 74 N. W. 613; Beers v. City of Watertown (S. D.), 177 N. W. 502; Hayes v. City of Seattle (Wash.), 207 Pac. 607. In Tukey v. City of Omaha (Neb.), 74 N. W. 613, the court said:

"The authority of the city government in the use and expenditure of the fund so provided was limited and strictly defined by the terms of the proposition so ratified by vote of the people. * * * That, when the governing body of a municipality is authorized by a vote of the people, and only thereby, to incur a debt for a particular purpose, such purpose must be strictly

complied with, and the terms of the authority granted be strictly and fully pursued, is so well settled that it would be idle to cite authorities on the proposition.''

The use of funds in the improvement of one highway which were authorized by the voters to be used in the improvement of another highway constitutes an unlawful diversion of the funds. In Heathman v. Singletary (Tex.), 12 S. W. (2d Ed.) 150, the court said:

''Had the plaintiffs in error pleaded and proved that the order, providing for the bond election, specified that the moneys should be expended on a highway between Riverside and Huntsville by way of Cline's Prairie, and that these moneys were about to be so used on another route as would deprive them of a similar highway by way of Cline's Prairie, they would have been entitled to the relief (an injunction) for which they prayed, and which the district judge granted.''

Did the voters authorize the expenditure of the proceeds of the bond issue upon a particular highway or road? Are the authorities about to expend the proceeds of the bond issue upon a road not authorized by the voters? We answer both questions in the affirmative. The proposition submitted at the election was:

''Shall the board of supervisors be authorized to issue bonds from year to year in the aggregate amount not exceeding $800,000 *for the purpose of providing the funds for draining, grading and hard surfacing the primary roads of the county?*'' (Writer's italics.)

When the voters voted in favor of said proposition, they voted for the expenditure of the funds upon the then primary roads of the county, and not upon some road which might thereafter be substituted for the then primary roads of the county. There is nothing ambiguous about the expression *''the primary roads of the county.''* It is clear, certain and definite. The proposition submitted by the ballot is in substantial accord with the statutory law. See Section 4753-a10, Code, 1927. Section 4755-b2, Code, 1927, provides:

''The primary road system shall embrace those main market

roads (not including roads within cities and towns) which connect all county seat towns and cities and main market centers, *and which have already been designated as primary roads under chapter 241, Code of 1924.*" (Writer's italics.)

At the time of the election, the primary roads of the county were Numbers 21 and 9, as then marked and designated. There can be no doubt that the voters voted for the expenditure of the money upon those highways as then designated and located.

Section 4755-b32, Code, 1927, provides:

"When any county has voted a bond issue for improvement of primary roads, such improvement program shall be completed *as authorized by the voters of said county.* Provided, all county primary road improvement programs and the amount of bonds to be issued therefor must be approved by the highway commission." (Writer's italics.)

The authority given by the voters of the county was to improve the then primary roads of the county. The program, consisting of grading, draining and hard surfacing of the roads authorized by the voters of the county at the election, is left to the approval of the State Highway Commission.

As we proceed, it must be borne in mind that this is not an action against the State Highway Commission, but an action to enjoin the issuance by the county officers of bonds, the proceeds of which it is claimed are about to be wrongfully diverted. The appellees contend that the State Highway Commission has authority to relocate a primary road. They rely upon our pronouncement in Jenkins v. State Highway Commission, 205 Iowa 523. The question involved in the instant case was not involved in the cited case. We there held that, by reason of the provisions of Section 4755-b36, Code, 1927, as applied to primary roads, the powers and duties formerly given to the boards of supervisors under Section 4607, Code, 1927, devolve upon the State Highway Commission; and that a change by the Commission in the course of a primary road whereby a cut-off therefrom joins the same primary road three miles from the point of departure is within the powers granted in said section. In view of our holding in the Jenkins case, Section 4607, Code, 1927, as applied to primary roads, reads as follows:

"Boards of supervisors (the State Highway Commission) on their own motion may change the course of any part of any road or stream, watercourse, or dry run, within any county in order to avoid the construction and maintenance of bridges, or to avoid grades, or railroad crossings, or to straighten any road, or to cut off dangerous corners, turns, or intersections on the highway, or to widen any road above statutory width, or for the purpose of preventing the encroachment of a stream, watercourse, or dry run upon a public highway."

We said in the Jenkins case:

"The only statutory provision for a change in primary roads *is to be found in Sections 4607 and 4621* [Code, 1927]."

The latter section referred to relates only to abandonment.

The appellees contend that a change in the course of a primary road may be made subsequent to the election, and that the expenditure of the money derived from the issuance of bonds upon that portion so changed would not constitute a diversion of the funds. In support of their contention, they cite Murph v. Macon County (Ga.), 146 S. E. 845. In the Georgia case, the change in the course of the road was quite similar to that in the Jenkins case, and the court held that such a change in the course of the road could be made "providing there was no material change in general direction and location of designated road," etc., and that the use of the money for the improvement upon such changed course would not be a diversion of the funds. With this holding of the Georgia court, as applied to the facts therein involved, we are disposed to agree. But the facts in the instant case are not analogous with those in the Murph and Jenkins cases. What is proposed to be done in the instant case is not an immaterial change in the general course of a primary road with a deviation or cut-off leading therefrom, and again connecting therewith a few miles distant from the point of deviation. What is proposed in the instant case is the complete substitution of at least ten miles of previously established highway and approximately two miles of newly constructed highway for that portion of No. 9 which had been previously designated, and two miles south therefrom. This substitution of substantially 12 miles of one highway for another in the same county is not a change in the course of the

highway within the purview of Sections 4607 and 4755-b36, Code, 1927. If it may be said that the use of the proceeds of the bonds for improvement of a highway twelve miles in length and two miles from the existing primary road at the time of the election does not constitute a diversion of the funds, then, by the same process of reasoning, it would not constitute a diversion of the fund to use the proceeds of the bonds for the improvement of a substituted road clear across the county, with spurs leading to the cities and towns, which road across the county may lie at a much greater distance from the formerly existing primary road. This constitutes an absurdity.

But the appellees contend that the State Highway Commission has the power, under Section 4755-b2, Code, 1927, to make the contemplated change. Said section contains the provision:

> "The primary road system shall embrace those main market roads (not including roads within cities and towns) which connect all county seat towns and cities and main market centers, and which have already been designated as primary roads under chapter 241, Code of 1924; provided, that the said designation of roads shall be, with the consent of the federal authorities, subject to revision by the state highway commission."

The contemplated change in the instant case is a revision within the purview of said section, but this revision was not made until after the voters at the general election on November 4, 1930, cast their ballots authorizing the issuance of bonds for the purpose of improving the then primary roads. The "program shall be completed as authorized by the voters." See Section 4755-b32, Code, 1927. Section 4753-a10, Code, 1927, provides that, "if any county desires to hasten the drainage and grading or the hard surfacing of *the primary roads of its county* at a more rapid rate than would be accomplished by merely employing each year its allotted portion of the primary road fund for said year, it may proceed" by submitting to the voters of the county, at a general or special election, "the question of issuing bonds for the purpose of raising funds to meet the cost of such work, and to provide for the retirement of such bonds and interest thereon." Said section further provides for the

giving of notice of said election, and that the question shall be set forth on the ballots substantially as follows:

"Shall the board of supervisors be authorized to issue bonds from year to year, in the aggregate amount not exceeding $........, *for the purpose of providing the funds for hard surfacing the primary roads of the county?*" etc. (Writer's italics.)

What is contemplated at the present time is the substitution, by way of revision, of another road twelve miles long, and lying two miles from what constituted the primary road at the time of the election. The statutory law does not contain, nor did the ballot contain, the provision: Shall the board of supervisors be authorized to issue bonds from year to year in the aggregate amount not exceeding $........... for the purpose of providing the funds for hard-surfacing the primary roads of the county or any other road which may be hereafter substituted therefor, and wheresoever the same may be situated within the county? The expenditure of the money to be derived from the sale of the bonds upon this substituted road would clearly constitute a diversion of the funds. To permit the expenditure of the proceeds of bonds for the improvement of said substituted road would be to perpetrate the rankest sort of fraud and deceit upon the voters of the county. It is true that the State Highway Commission has the power to make the substitution by way of revision, with the consent of the federal authorities, but since it did not do so until after the election at which the voters authorized the improvement of the then primary roads, the taxpayers have the right to demand that the proceeds of the bonds be not used for the improvement of any roads other than what constituted the primary roads at the time of the election, except such changes in the course of a primary road within the county as come within the purview of, and not sufficient in extent to transcend the power given the State Highway Commission in this respect by, Sections 4607 and 4755-b36, Code, 1927. It therefore follows that the trial court was in error, and that an injunction should be granted restraining the issuance of bonds for the improvement of whatever portion of new No. 9 was not substituted for old No. 9 prior to the time of the holding of the election.

It is contended by the appellees that the plaintiff is an

improper party and cannot maintain the action. Equity will always grant relief to a taxpayer by injunction against illegal diversion of public funds. The plaintiff is a taxpayer of Osceola County, owning 880 acres of land within the county, and as such taxpayer he has the right to maintain this action for injunction. See MacGregor v. Miller (Ill.), 154 N. E. 707; Tukey v. City of Omaha (Neb.), 74 N. W. 613; Heathman v. Singletary (Tex.), 12 S. W. (2d Ed.) 150; Castilo v. State Highway Commission (Mo.), 279 S. W. 673.

The appellant further pleads that said proposed bond issue is illegal and void for the reason that there is no adequate provision for the retirement of such bonds and the payment of the interest thereon, and for the further reason that the 5-mill levy provided therein is wholly inadequate for the purpose of paying the interest and retiring the bonds. Section 4753-a11, Code, 1927, provides that no bonds shall be issued with maturity date postponed more than fifteen years. It is shown that a five-mill levy upon the property of Osceola County will annually raise about $35,000, and that under the law said county will receive annually from the primary road fund a sum of approximately $114,000. It is thus apparent that there is ample provision for the payment of both the interest and principal of the bonds. It is provided by Section 4753-a12, Code, 1927, that "the board of supervisors shall, each year thereafter during the life of the bonds, levy on all the property of the county such part of such authorized tax as will clearly meet (1) the matured or maturing interest for the ensuing year on all such outstanding bonds, and (2) any amount of maturing principal of bonds, * * *" The appellant argues: "The primary road fund is available only for principal when bonds mature." In this he is in error, as it is provided by Section 4755-b4, Code, 1927, that the primary road fund is appropriated and shall be used for the payment of interest and redemption of any bonds issued in anticipation of said primary road fund. He makes some contention relative to the proviso contained in Section 4753-a10, Code, 1927, which is substantially shown upon the ballot hereinbefore copied. The form of the ballot is in substantial compliance with the statute. The appellant makes no attack upon the constitutionality of the law. The statute provides for the use of the primary road fund for the purposes hereinbefore

mentioned, and the amount thereof to which Osceola County is entitled is the amount hereinbefore stated. We cannot assume that there will be any insufficiency of funds legally available with which to pay the interest and retire the bonds authorized to be issued within the period of fifteen years. The burden of proof to sustain the aforesaid allegations of his petition is upon the plaintiff. It is sufficient to say that the plaintiff has failed in his proof as to the aforesaid allegations of the petition.

Upon the whole case, we hold that the judgment of the lower court should be modified so as to grant a temporary injunction restraining the issuance of bonds for the improvement of whatever portion of new No. 9 was not substituted for old No. 9 prior to the time of the holding of the election.—Modified.

Faville, C. J., Stevens, De Graff, and Albert, JJ., concur.

Kindig, Evans, Morling, and Grimm, JJ., dissent.

Kindig, J., Dissenting—Feeling that the majority are committing a serious error, I am compelled to dissent. A re-statement of the material facts, as they relate to the law involved, will make plain the erroneous conclusion reached by the majority.

At the general election, held in November, 1930, in Osceola County, there was submitted to the county voters the following proposition:

"Shall the Board of Supervisors be authorized to issue bonds from year to year, in the aggregate amount not exceeding eight hundred thousand dollars, for the purpose of providing the funds for draining, grading, and hard surfacing the primary roads of the county, and to levy a tax on all property in the county from year to year not exceeding five mills in any one year, for the payment of the principal and interest of said bonds, provided, however, that the annual allotments to the county of the primary road fund shall be used to pay interest and retire said bonds as they mature, and only such portion of said tax shall be levied, from year to year as may be necessary to meet any deficiency, if any, between the amount of the interest and principal of the bonds and the said allotments from the primary road funds?"

A majority of the electors voted in favor of the proposition. After the election the state highway commission, under the authority of Jenkins v. State Highway Commission, 205 Iowa 523, changed the Osceola primary road No. 9, as contemplated by section 4755-b2 of the 1927 Code.

Having made a change in the primary road after the election, in the manner and way aforesaid, can the proceeds from the bond sale be used as contemplated? That is the first question.

Appellant contends that such fund cannot be thus used because the electors of the county voted to pave, not the changed highway, but only the roads which, on election day, were in the primary system. Through that argument, appellant insists that said particular roads were pointed out in the ballot, and thereby separated from the general system of primary roads as the same is changed and constituted from time to time. According to his theory, a basis for this conclusion can be found in the following language of the ballot, before quoted, wherein the highways to be paved are designated as "the primary roads of the county." By using the word "the," appellant says, the legislature intended to specify the roads in the primary system as then constituted. When so reasoning, appellant entirely overlooks the statutory classification of highways. The same Code chapter that specifies the form of the ballot also separates the highways into primary and secondary, and empowers the highway commission to change those systems from time to time by adding thereto or taking therefrom. After such change, according to the statutory scheme, the particular system still remains primary or secondary, as the case may be. Then, when the word "the" is used in the ballot, as before explained, it refers to the primary roads, and thus distinguishes that system from the secondary.

An answer, therefore, to the above-named inquiry may be found in the statutes involved. Section 4755-b2 of the 1927 Code contains, among others, the following provision:

"The highways of the state are, for the purposes of this chapter (the one authorizing the bond issue), divided into two systems, to wit: the primary road system and the secondary road system."

Likewise, as before said, a primary system, once established, is always subject to change and revision under the terms of said

section 4755-b2. A fundamental consideration at this juncture is that the statute contemplates a primary and secondary system. Therefore, under the legislation, there are two designations: the one relates to primary roads, and the other to secondary. Hence, when the voters in Osceola County cast their ballots on the election day, they determined whether or not bonds should be issued "for the purpose of providing the funds for draining, grading, and hard surfacing the primary roads of the county." "The primary roads of the county" distinguished the highways in question from the secondary system. There was no other purpose in using the words "the primary roads of the county" on the ballot.

Remembering, as we must, that the legislature itself divided those highways in the county into two groups, first primary, and then secondary, it becomes quite clear that the legislature, by authorizing the words in the ballot, to wit, "the primary roads of the county," intended to distinguish those primary roads from the remaining secondary highways. Under no circumstances did the words "the primary roads of the county" indicate the road that happened to be running by B's farm, C's corner, or D's oil station. Rather than that, the language "the primary roads of the county," as before suggested, had reference to the systems: that is to say, the primary and secondary roads. Again, the very statute that classifies the roads into primary and secondary systems likewise authorizes the state highway commission to revise the system. Such revision was sustained by this court in Jenkins v. State Highway Commission (205 Iowa 523), supra. When thus revised, the new portion automatically becomes a part of the primary system, and the old part goes back into the secondary. Then when pavement is placed upon that new portion, a part of the primary system thereby is improved. Wherefore, after the change as before, the roads included still remain and constitute "the" primary system. Those roads, therefore, thus legally included, whether before or after the election, constitute "the" primary system named in the ballot.

According to section 4755-b2, above, the purpose of such revision is to afford "access to cities, towns, or state parks, or (to shorten) the direct line of travel on important routes, or to effect connections with interstate roads at the state line."

Express legislative language empowers the state highway commission to make the very change under consideration in the case at bar. Primary No. 9 extends from the Dakota line to the Illinois line in an easterly and westerly direction across the entire state of Iowa. Only a few miles, then, of Primary No. 9 are involved in the change. Several miles are saved by the change. Under the Jenkins case (205 Iowa, 523), above cited, such change is permissible. Because of the circumstances here presented, the people of the entire state of Iowa, as well as the inhabitants of Osceola County, are interested in the change. See the Jenkins case, supra. Clearly, then, the result of the vote was to authorize bonds for the purpose of improving the primary system, including the changed portion, rather than the designation of any particular road to be improved without reference to the changed system.

Must such change, then, be made before the vote? Manifestly not, as seen by the foregoing discussion. Murph v. Macon County (Ga.), 146 S. E. 845. Primary road systems are continually under the control of the highway commission. That body may make changes on the highway system, as contemplated by the foregoing legislation. Consequently, the voters are not legally interested in whether or not the highway commission (while acting within its legal discretion) shall perform its duty this way or that way, or whether that body shall make this change or that change, but rather, the voter expresses his approval or disapproval of anticipating the primary road funds by the issuance of bonds for the primary system, which is thus in control of the highway commission. Many times, a change contemplates expense which would not be practical or wise unless bonds are issued. So it must be expected, under the law, that the change, as authorized, may be made by the highway commission after the election. The change in question avoided many corners. Thereby danger was avoided and convenience served. It does not appear that there would have been immediate funds with which to make such change without the bond issue. Moreover, unless the new road were to be immediately paved, no doubt the expense of making the change would have been unwise and undesirable. Thus it is plain that the state highway commission may perform its administrative function in making the authorized changes in highways, even after the

vote has been taken. Otherwise, the very purpose of the law would be thwarted, and the power given the commission denied. Of course, it is true that bonds must be used for the purpose voted. See 44 Corpus Juris 1209; Tukey v. City of Omaha (Neb.), 74 N. W. 613; Beers v. City of Watertown (S. D.), 177 N. W. 502; Hayes v. City of Seattle (Wash.), 207 Pac. 607; Heathman v. Singletary (Tex.), 12 S. W. (2d Ed.), 150. But here we have no such question involved as that discussed in those cases. If the money is expended on the primary road system of Osceola County, no voter has a right to complain; for if so expended, the money is used in the way contemplated by the statute. That voter we cannot assume would have cast his ballot differently, had he known that the primary highway system of the county would pass his neighbor's farm, rather than his own. The system is for the service of the county and state, rather than the enhancement of the value of a particular farm. Certainly, when contemplating the primary highway system, it cannot be said that a particular farm or a certain town is more sacred than any other farm or town in the county.

Fraud is not involved, and cannot be, under the circumstances. Every voter who cast his ballot for the bonds in question knew that, under the legislation aforesaid, the state highway commission could make this very change. Furthermore, that voter also understood that the state highway commission could not barter away that right. Public policy is involved, and it is important to the people that the highway commission be free at all times to exercise its power and authority in the establishment and relocation of roads. This is not a new doctrine. Upon many occasions, this court said that a city council, for instance, cannot bargain away its power to fix electric light, gas, and water rates. See Town of Williams v. Iowa Falls Elec. Co., 185 Iowa 493; City of Tipton v. Tipton L. & H. Co., 176 Iowa 224; Iowa Railway & Light Co. v. Jones Auto Co., 182 Iowa 982.

Under our government, the legislature is permitted, in its wisdom, to place in public bodies authority for the public good. When thus placed, such power cannot be bargained away or given up by such body. Said body must at all times exercise that power for the public good. There is nothing in the ballot now under consideration that could in any way have misled

the voters in Osceola County. For the only proposition expressed in the plain English language of that ballot was whether the primary, as distinguished from the secondary, roads were to be paved. Hence, there is no basis for the argument that the people were misled.

On the other hand, if the appellant is to prevail, the very will of the voters will be thwarted. Now, the primary road is the new road, not the old. Consequently, if the highway commission paves the old road at this time, it is improving a secondary, and not a primary, highway; because, under the statute above referred to, a discarded primary road becomes a part of the secondary system. Obviously the voters did not authorize that. Nor could such electors legally intend or lawfully expect that the highway commission of this state should enjoin or estop itself from exercising the governmental function in it vested, to wit, the right to change and relocate highways under the aforesaid statute.

Resultantly the district court properly denied the injunction.

EVANS, MORLING, and GRIMM, JJ., join in the dissent.