LEWIS SCHARNBERG, Appellant, v. IOWA STATE HIGHWAY COMMISSION et al., Appellees.

No. 41486.

JUNE 24, 1932.

George A. Heald, Jr., and Buck & Kirkpatrick, for appellant.

John Fletcher, Attorney-general, Maxwell A. O'Brien, Assistant Attorney-general, and Baldwin & James, for appellees.

Lovrien & Rader, Cornwall & Cornwall, and Cory & Sackett, for interveners.

FAVILLE, J.—In 1913 the thirty-fifth general assembly, by Chapter 122, created a state highway commission. In 1916 Congress passed the Act of July 11, which, among other things, provides as follows:

"That the Secretary of Agriculture is authorized to cooperate with the states, through their respective state highway departments, in the construction of rural post roads; but no money apportioned under this Act to any state shall be expended therein until its legislature shall have assented to the provisions of this Act, except that, until the final adjournment of the first regular session of the legislature held after the passage of this Act, the assent of the governor of the state shall be sufficient. The Secretary of Agriculture and the state highway department of each state shall agree upon the roads to be constructed therein and the character and method of construction: *Provided*, That all roads constructed under the provisions of this Act shall be free from tolls of all kinds, * * *

"That for the purpose of this Act the term 'rural post road' shall be construed to mean any public road over which the United States mails are now or may hereafter be transported, excluding every street and road in a place having a popula-

tion, as shown by the latest available Federal census, of two thousand five hundred or more, except that portion of any such street or road along which the houses average more than two hundred feet apart; * * *

"That any state desiring to avail itself of the benefits of this Act shall, by its state highway department, submit to the Secretary of Agriculture project statements setting forth proposed construction of any rural post road or roads therein. If the Secretary of Agriculture approve a project, the state highway department shall furnish to him such surveys, plans, specifications, and estimates therefor as he may require."

Thereafter, in 1917, the thirty-seventh general assembly enacted Chapter 249, Section 2 of which is as follows:

"The state highway commission is hereby authorized and directed, as soon as may reasonably be done, to designate and select from the roads which are now or hereafter may become rural post roads, including a part of each of the ninety-nine counties of the state and including not less than two thousand nor more than six thousand miles, giving equitable consideration to the claims of each county, said system to be so selected and designated as to at least meet the requirements of the Federal act and a sufficient number of miles to at least require the full appropriation provided for by the Federal act during the life of said statute. Before designating the roads of such system, the state highway commission shall request the co-operation and assistance of the boards of supervisors of the respective counties, and shall give due consideration to the judgment of each of said boards in such designations."

It appears that under said Chapter 249 of the Acts of the Thirty-seventh General Assembly, certain roads in Clay County were designated by the state highway commission, with the approval of the proper officers of the Federal government, as primary roads. They were existing and duly established highways prior to that time. Under the terms of the statute, the selection was to be "from the roads which are *now or hereafter may become rural post roads.*" (Writer's italics.) It contemplated *existing roads* and such as either at the time or in the future might become rural post roads. It is also provided by said act

that the selection of primary roads is to be made with "the co-operation and assistance of the boards of supervisors."

It is a matter of common knowledge that the selection of the primary roads became in many instances a matter of public interest, and in some cases petitions and protests were filed and hearings were had. The whole proceedings had to do with the selection of existing roads.

It appears that certain roads of Clay County were duly selected as primary roads. These connected the county seat and the main market towns of the county. After their selection as primary roads and their approval by the Federal government as such, two of them were marked and designated as U. S. 18 and U. S. 71. In a general way, it may be said that U. S. 71, as so located and designated and marked, extended north and south through Clay County very nearly through the center of said county, and passed through Spencer, the county seat. U. S. Highway 18, as so selected and designated and marked, passed in a generally east and west direction through said county, and also passed through the county seat and connected it with the town of Dickens, nearly seven miles east of the county seat.

There can be no question but that the selection, designation, and marking of these highways as primary roads became generally and publicly known in Clay County. These, with two others of less extent, became the primary roads of said county. Their status as such was fixed and established, and had been so maintained for some years prior to the bond election involved in this case.

Many changes in the road laws have been made since Chapter 249 of the Acts of the Thirty-seventh General Assembly was enacted. The statutes applicable to this case are now included in the Code of 1931, to which we refer for convenience. Section 4755-b2 of said Code is as follows:

"The highways of the state are for the purposes of this chapter divided into two systems, to wit: the primary road system and the secondary road system. The primary road system shall embrace those main market roads (not including roads within cities and towns) which connect all county seat towns and cities and main market centers, and which have already been designated as primary roads under Chapter 241, Code of

1924; provided that the said designation of roads shall be, with the consent of the Federal authorities, subject to revision by the state highway commission. Any portion of said primary system so eliminated by any changes shall revert to and become a part of the system from which originally taken. The state highway commission may, for the purpose of affording access to cities, towns or state parks, or for the purpose of shortening the direct line of travel on important routes or to effect connections with interstate roads at the state line, add such road or roads to the primary road system, but no other increase shall be made in the mileage of the primary roads until the present primary road mileage has been completed as this chapter provides."

The roads in question here had already been designated under Section 2 of Chapter 249 of the Acts of the Thirty-seventh General Assembly (Chapter 241, Code of 1924) as primary roads, so that there was legislative recognition of these roads as the primary roads of Clay County.

Code, 1931, Section 4755-a10, provided in part as follows:

"If any county desires to hasten the drainage and grading or the hard surfacing of the primary roads of its county at a more rapid rate than would be accomplished by merely employing each year its allotted portion of the primary road fund for said year, it may proceed as follows: The board may submit, or, upon petition of a number of the qualified voters of the county equal to twenty per cent of the total vote cast in said county at the last preceding general election, presented to the board in writing so to do, must submit to the voters of the county at a general election, or at a special election called by the board for such purpose, the question of issuing bonds for the purpose of raising funds to meet the cost of such work, and to provide for the retirement of such bonds and interest thereon. Notice of such election shall be given by publication once each week for two successive weeks in all the official newspapers of the county, stating the time when such election will be held, and substantially the proposition that will be submitted; the last publication to be at least five days prior to the day such election is to be held. Special elections shall be conducted in the same manner as general elections are conducted. Said question shall be set forth on the ballots substantially as follows: 'Shall the board of super-

visors be authorized to issue bonds from year to year, in the aggregate amount not exceeding ................ dollars, for the purpose of providing the funds for hard surfacing the primary roads of the county, and to levy a tax on all the property in the county from year to year not exceeding ................ mills in any one year, for the payment of the principal and interest of said bonds, provided, however, that the annual allotments to the county of the primary road fund shall be used to retire said bonds as they mature, and only such portion of said tax shall be levied from year to year as may be necessary (1) to pay the interest annually, and (2) to meet any deficiency, if any, between the amount of the principal of the bonds and the said allotments from the primary road fund, together with assessments on benefited property provided by law.' ''

Pursuant to the provisions of said statute a bond election was held in Clay County on December 17, 1930. At the bond election the question submitted to the voters was:

''Shall the Board of Supervisors be authorized to issue bonds from year to year, in the aggregate amount not exceeding one million two hundred seventy-three thousand dollars, for the purpose of providing the funds for draining, grading and hard surfacing the primary roads of the county and to levy a tax on all property in the county from year to year, not exceeding five mills in any one year, for the payment of the principal and interest of said bonds, provided, however, that the annual allotments to the county of the primary road fund shall be used to pay interest and retire said bonds as they mature and only such portion of said tax shall be levied from year to year as may be necessary to meet any deficiency, if any, between the amount of the interest and principal of the bonds and the said allotments from the primary road funds?''

As stated, at the time of said bond election, primary roads U. S. 18 and U. S. 71 were established, designated, and marked as such. The voters of the county had an opportunity to be fully informed, not only by the official records, but by the visible markings and designations as to just what roads were the primary roads of the county that were involved in the bond election.

The proposition submitted to the voters of Clay County was one for the issuance of bonds for the improvement of said primary roads that had been duly designated by the state and Federal authorities, ratified by the legislature, and marked, maintained, and publicly known as the primary roads of said county. The voters of Clay County authorized the board of supervisors to issue bonds, back of which was pledged the taxable property of the taxpayers, for the improvement of *these* roads, not some other roads either existing or nonexistent. No one at said election was voting on the question of improving any other or different roads than "*the* primary roads of said county" as they then existed. Had the question of abandoning nearly seven miles of the existing primary road between Spencer and Dickens as a primary road, and the buying of a new right of way and the building of a new road to be connected with Dickens by a stub, been before the voters, the result of the election might have been entirely different. Such a proposition was not suggested or involved in the election.

The question then arises: Does the board of supervisors of Clay County have the authority to now issue bonds authorized by said election and devote the proceeds thereof to the acquiring and improving of an entirely new road that was not a part of the primary roads of Clay County, for the improvement of which the bonds were authorized to be issued? There can be but one answer to this question, and that is in the negative. U. S. 18, the road between Spencer and the town of Dickens, had been in existence for many years, and for a long time prior to and at the time of the bond election, it was the duly established primary road between said two towns. It was to improve *this* primary road (and others) that the bond issue was authorized. It now appears, however, from the stipulated facts in this case, that it is the purpose of the state highway commission to abandon said road as a primary road between said two towns, and to construct an entirely new road as a part of the primary road system of said county. It also appears that, unless enjoined by the court, the board of supervisors of Clay County will issue bonds and turn the proceeds thereof over to the state highway commission for the purpose of acquiring and constructing said new road. It appears that the state highway commission proposes to locate said new road approximately one mile south of

the existing primary road No. 18. The proposed new road will be six and five-eighths miles in length, and it is stipulated "that of the six and five-eighths miles of the proposed new location of No. 18, all but two and one-half miles is located where there is now no road open to the public and no road graded, except that for one and one-half miles thereof a road has been established but has never been opened and used." In other words, a considerable portion of the proposed new location will be through a territory where there is now no highway right of way, and a portion upon an established highway that has never been opened and used.

There is evidence in the record tending to show that from an engineering standpoint the construction of the new highway will avoid certain difficulties, such as a cut and an obscured railroad track and the crossing of two lines of railroads, the passing of two schoolhouses, and a switch yard, and other similar matters; while, on the other hand, the proposed new highway will require the securing of a new right of way, the construction of a bridge and approaches some five hundred feet in length, the building of an underground railroad crossing, and the building of a so-called "stub" into the town of Dickens, which would cross the railroad track in said town.

Upon the question of the relative desirability of the two locations from an engineering standpoint we make no pronouncement. The question for us to decide is a legal one, and can be thus stated: Can the board of supervisors of Clay County, by turning over said funds to the state highway commission, or by other means, lawfully divert the funds received from the sale of bonds authorized by the voters of Clay County for the improvement of primary roads as expressed at the election of December 17, 1930, to any other purpose than that expressly authorized by said election? Or, to state it another way: Can the board of supervisors permit or authorize the use of said funds for the purpose of acquiring a new right of way and constructing a bridge and building a new road entirely different from the primary roads that existed at the time of said bond election? The statute itself is a complete answer to the question. Code Section 4755-b32 provides in part as follows:

"When any county has voted a bond issue for improvement

of primary roads, such improvement program *shall be completed as authorized by the voters of said county.* Provided, all county primary road improvement programs and the amount of bonds to be issued therefor must be approved by the highway commission."

This is plain and explicit. It is a legislative command that cannot be avoided, ignored, or thrust aside. It means just what it says.

What did the voters of Clay County authorize as the "improvement program" of the primary roads of said county?

The proposition submitted to the voters of Clay County was, by its very terms, definitely limited to certain specific things. It was not a general proposition to issue bonds and turn the proceeds over to the state highway commission for general primary road improvement as the state highway commission might see fit. The question submitted on the ballot was to issue bonds *"for the purpose of providing funds for draining, grading, and hard surfacing the primary roads of the county."* There was no suggestion in this proposal of using the funds to purchase a new right of way some miles in extent, and distant from said primary road. Such is not *"draining, grading, or hard surfacing."* Nor is there a hint in the ballot of the expenditure of thousands of dollars in the building of a bridge on a newly acquired right of way. The voters of Clay County at the election authorized the issuance of bonds for the three purposes named, to wit, *"draining, grading, and hard surfacing."* No proposition was submitted to them to use said funds for any other purposes, and by legislative fiat these funds *"shall"* be used *"as authorized by the voters."* It must inevitably follow that this bond money was only authorized by the voters of Clay County to be used in the improvement of the primary roads of said county as they were designated at the time of said bond election, and only for such form of improvement as the voters specifically authorized, to wit, "draining, grading, and hard surfacing." The board of supervisors must obey this mandate of the statute and the authorization of the electorate, even though it may appear to them that some other procedure is more desirable. They cannot divert the funds voted by the electors of said county to other and different purposes than those expressly

authorized by the statute and by the voters. The voters of Clay County by their ballots declared what these bonds should be used for. It is fundamental that this is a limitation on the power of the board of supervisors to use said bonds for any other purpose or purposes. When the voters of Clay County, with a definite and certain proposition before them, and with primary roads established, designated, and made of record by the proper officials and approved by the state legislature, voted to improve *said* primary highways *in certain and definite ways,* the funds so voted cannot be used to build some other and entirely different highway, or be used in a manner not specifically authorized by the voters. This the statute in terms forbids.

We had a similar question before us in the recent case of Harding v. Board of Supervisors, 213 Iowa 560. It is unnecessary that we repeat the discussion contained in the opinion in said case. We therein held that when a primary road had been duly established and designated as a primary road of a county, and a question was submitted to the voters with regard to the issuance of bonds to improve said primary road, the funds so authorized by the voters could not be diverted by the board of supervisors to the improvement of another road than the one so authorized to be improved. We adhere to the rule therein announced.

II. It is strenuously argued, however, that the proposed change is "an immaterial change" of primary road No. 18, and therefore that the highway commission has a right to make such a change. It is contended that the new road is still No. 18, and that the so-called "relocation" is a mere "immaterial change." We have already detailed the essential facts, and these alone are a sufficient answer to this contention. This is no slight, inconsequential, or immaterial change to avoid some difficulty of construction while retaining the road in substantially its original location. We have no such situation as was considered in Jenkins v. Highway Commission, 205 Iowa 523, 525, or Long v. Highway Commission, 204 Iowa 376. Here it is proposed to abandon an established highway some seven miles in length, and go a mile distant and blaze a new path through a new territory, where no road has ever existed for much of the way. Under no fair or reasonable construction of the term could the change proposed be held to be "a mere immaterial change."

In Harding v. Board of Supervisors, supra, we said:

"The appellees contend that a change in the course of a primary road may be made subsequent to the election, and that the expenditure of the money derived from the issuance of bonds upon that portion so changed would not constitute a diversion of the funds. In support of their contention, they cite Murph v. Macon County (Ga.), 146 S. E. 845. In the Georgia case, the change in the course of the road was quite similar to that in the Jenkins case, and the court held that such a change in the course of the road could be made, 'provided there is no material change in general direction and location of designated road,' etc., and that the use of the money for the improvement upon such changed course would not be a diversion of the funds. With this holding of the Georgia court, as applied to the facts therein involved, we are disposed to agree. But the facts in the instant case are not analogous with those in the Murph and Jenkins cases."

The voters did not authorize the expenditure of the *county* bond money on such a road, and it cannot be so used, under the statute.

▆ III. The appellant sought a mandatory injunction to compel the state highway commission "to proceed with the improvement of said primary roads No. 18 and 71 as they were located at and prior to the time of said election * * * and to spend and use for such purpose funds derived from the sale of Clay County primary road bonds."

The courts can restrain the illegal use of the proceeds of county primary road bonds, but cannot by mandatory injunction *compel* the expenditure of such authorized funds by a commission which has a large discretion as to whether or not such funds shall be used, although authorized by the voters.

Appellant also sought a mandatory order that "in the event funds derived from the sale of Clay County primary road bonds are insufficient that the defendants be required to use and spend on said improvements state primary road funds."

A very wide discretion is vested in the state highway commission in the construction of primary roads by the use of state primary road funds. A vast sum is at its disposal annually for said purpose. Every presumption must be indulged that the

state highway commission will proceed legally in all highway matters within its jurisdiction. The courts do not interfere with the legal exercise of the discretion vested in such an administrative tribunal.

In Long v. State Highway Commission, 204 Iowa 376, we said:

"The state highway commission are agents of the state, acting for and in behalf of the state, within the powers conferred upon them by the statute. This action is an attempt by injunction to control the manner in which the said agents of the state shall exercise the authority vested in them. Although nominally asserted against the appellees, the action is, in effect, one against the state. Under such situation, it cannot be maintained by appellant. Hollingshead Co. v. Board of Control, 196 Iowa 841; Cross v. Donohoe, 202 Iowa 484. There is no allegation of fraud, illegality, misconduct, breach of duty, or other wrongful act on the part of appellees. Under such circumstances, the courts have no jurisdiction by injunction to restrain the action of the agent of the state in good faith in regard to a matter vested by the state within the discretion of such agent. As bearing somewhat upon the general proposition, see, also, Perry v. Board of Supervisors, 133 Iowa 281; Leonard v. Wakeman, 120 Iowa 140; Brewster v. City of Davenport, 51 Iowa 427; Kirchner v. Board of Directors, 141 Iowa 43; McCarl v. Clarke County, 167 Iowa 14; Walker v. City of Des Moines, 161 Iowa 215."

A taxpayer cannot, by a suit for a mandatory injunction, control the discretionary action of the state highway commission in relocating a highway and expending state primary road funds thereon, or proceeding in any legal and proper manner under the power granted to it by the statutes. There is no showing in this case that would entitle appellant to the affirmative relief of a mandatory order as prayed.

For the reasons pointed out, the order of the trial court must be reversed in part and the cause remanded with directions to said court to enter a decree in accordance with this opinion.— Affirmed in part; reversed in part.

WAGNER, C. J., and STEVENS, ALBERT, and DE GRAFF, JJ., concur.

KINDIG, EVANS, MORLING, and GRIMM, JJ., specially concur.

KINDIG, J. (specially concurring).—Without reservation, I fully concur in Division III of the opinion. But I concur in Divisions I and II of the opinion only because of the majority holding in Harding v. Board of Supervisors, 213 Iowa 560. Four justices, including myself, dissented in the Harding case. Nevertheless, the rule there announced became the law of this state because that opinion was adopted by a majority of the court. For that reason and none other, I concur in Division I and II of the opinion.

EVANS, MORLING, and GRIMM, JJ., join in this special concurrence.