165 So.2d 95

Mary Harris WOOD et al.

v.

CITY OF BIRMINGHAM et al.

6 Div. 892.

Supreme Court of Alabama.

May 21, 1964.

Wm. A. Thompson, Birmingham, and Julius T. Cage, Jr., Montgomery, for appellees.

R. Clifford Fulford and Levine, Fulford & Gwaltney, Birmingham, for appellants.

PER CURIAM.

This action was brought by the appellants, resident taxpayers of the City of Birmingham, Alabama, to enjoin that city

and certain of its officials (appellees here) from using the proceeds of certain bonds for the construction of a proposed Red Mountain Expressway in Jefferson County, Alabama. The bonds in question were authorized by the electorate of Birmingham for highway improvement at a city election in 1960. The bond issue approved contained the following language:

> " * * * for the purpose of improving highways in the City of Birmingham, including the widening, elevating and depressing of streets, the separation of grades of streets from grades of railroad tracks, and for the incidental purpose of acquiring rights of way for any such improvements and of paying any damages which may be caused thereby to abutting property owners, which bonds shall be secured by the full faith and credit of said city, * * *."

In March, 1962, the State of Alabama and Jefferson County entered into an agreement, and Jefferson County and the municipalities of Birmingham, Homewood, Mountain Brook and Vestavia Hills entered into another agreement, whereby the City of Birmingham agreed to pay $525,000 to Jefferson County. Jefferson County was to add this to the sums paid to it by the other municipalities, add a contribution of its own, and pay the aggregate sum to the State of Alabama, which would use it, together with matching federal funds, for the acquisition of rights of way and construction costs of the project. Provision was thus made for $3,750,000 of the total estimated cost of $11,700,000. This $3,750,000 was to be used to pay for the first of three phases of the proposed expressway.

By their complaint, the complainants sought a temporary and permanent injunction to prevent the proposed construction. The original complaint was amended four times and demurrers to it filed and re-filed. Respondents also filed an answer and amended answer. Ruling on the demurrers was reserved subject to a finding of the equity of the bill. The court heard the evidence ore tenus for six days; note of testimony was filed and the cause submitted for decree on July 12, 1962. On July 16, 1962, the trial court entered its decree overruling application for injunction pendente lite, and denying writ. From that decree this appeal was perfected.

■ There is but one real issue in this case; that is, whether or not the proposed expressway may be built with the proceeds of the funds raised pursuant to the above-quoted authorization. Stated more simply, the issue is whether or not the construction of a new facility was contemplated when the electorate approved a bond issue "for the purpose of improving highways in the City of Birmingham." It is undisputed that bond proceeds may be used only for the particular purpose authorized by the voters, and the use of the same for any other purpose constitutes an unlawful diversion of the funds. Court of County Revenues for Lawrence County v. Richardson, 252 Ala. 403, 41 So.2d 749; Southern Ry. Co. v. Jackson County, 189 Ala. 436, 66 So. 570.

It is appellants' contention that in order that there be an "improvement" there must presently exist something to improve, and that, therefore, the proceeds from bonds voted for the purpose of "improving" highways can be applied only to the betterment of highways established and existing when the bond issue was approved by the electorate.

This particular question has never been presented to this court, but it has been decided in other jurisdictions. Appellants rely largely upon Wolff Chemical Co. v. City of Philadelphia, 217 Pa. 215, 66 A. 344, decided in 1907. Although we think it can be distinguished from the instant case, we concede that it holds that a bond issue "for continuing the improvement of the boulevard from Broad street northeastward" did not include the spending of any money for the payment of damages to property owners for the taking of their property for a right of way for the boulevard.

Appellees rely on Meyering v. Miller, 330 Mo. 885, 51 S.W.2d 65, decided in 1932. There, the voters in St. Louis approved bonds, the proceeds of which were to be used "For the acquisition of land and the construction of *additions* and *extensions* and equipment of public hospitals" (emphasis supplied). Meyering, a taxpayer, sought to enjoin the city from using some of the money to acquire land and build a new hospital. The city answered, demurrer to the answer was overruled, the taxpayer declined to plead further and appealed from the order dismissing his bill. The opinion was written by a commissioner who later became the famous Chief Justice Hyde of the Supreme Court of Missouri, and all the Justices concurred in the holding that the city was authorized to build separate new hospitals. The court said:

"The primary rule of construction of statutes or ordinances is to ascertain and give effect to the lawmakers' intent. 2 Lewis' Sutherland on Stat. Const. (2d Ed.) § 363. The rule of strict construction 'has lost much of its force and importance in recent times, since it has become more and more generally recognized that the paramount duty of the judicial interpreter is to put upon the language of the legislature, honestly and faithfully, its plain and rational meaning and to promote its object.' Endlich on Interpretation of Statutes, § 329; Maxwell on Statutes (5th Ed.) 425. The report of the special committee of the board of aldermen gives some light on their intent. 36 Cyc. 1139.

"Strict construction 'does not mean that whenever a controversy is or can be raised of the meaning of a statute, ambiguity occurs, which immediately and inevitably determines the interpretation of the statute. * * * Its proper office is to help to solve ambiguities, not to compel an immediate surrender to them. * * * Will courts ever be exempt, or have they ever been exempt, from that duty?

Has skill in the use of language ever been so universal, or will it ever be so universal, as to make indubitably clear the meaning of legislation? Has forecast of events ever been so sure, or will it ever be so sure, as to make inevitably certain all the objects contemplated by a statute? We think not, and there never will be a time in which judicial interpretation of laws will not be invoked, and it cannot be omitted because a doubt may be asserted concerning the meaning of the legislators.' Citizens' Bank of Louisiana v. Parker, 192 U.S. 73, 24 S.Ct. 181, 186, 48 L.Ed. 346. Likewise, it has been said that strict construction 'is not a precise but a relative term. It is not the exact converse of liberal construction, for it does not consist in giving words the narrowest meaning of which they are susceptible.' 2 Lewis' Sutherland on Stat.Const. (2nd Ed.) § 519; Biffer v. City of Chicago, 278 Ill. 562, 116 N.E. 182. Considering the ordinance here in the light of these principles and the circumstances disclosed by the record, it would seem reasonable that the intent and object of proposition 12, in providing the sum of four and one-half million dollars for a ten-year plan expansion of hospitals and institutions, for the care of delinquents and indigent patients, to provide for the future needs and growth of the city, was not merely to increase the size and capacity of each separate unit of its present institutions, but that it also contemplated the addition of separate new units if, and when, they were determined necessary for the increase, enlargement, or expansion of the service of the whole organization, combination, system, or department of public hospitals and other institutions, referred to, maintained by the city of St. Louis; and we so hold."

In Murph v. Macon County, 167 Ga. 859, 146 S.E. 845 (1929), the taxpayers sought to enjoin the county from applying proceeds of a bond issue to a new portion of

the Dixie Highway which was not in existence when the election was held and was not in the question proposed to the voters. The question voted on was whether the funds should "be applied *alone* to the work of paving the public road of said county leading from the line of Peach county, through said county of Macon, to the line of Sumter county, known as the Dixie Highway." (Emphasis supplied.) The taxpayers contended that the funds could not be used "for the purpose of paving the proposed new route, for the reason that the bond money was specifically voted by the people of Macon county (and it was so understood by them at the time) to pave the said highway 'alone,' as it was then and had been theretofore officially designated, located, and maintained, and was not voted, nor did the people of the county so understand that it would be used, for paving any subsequent relocations of said highway or any part thereof."

The court, Chief Justice Russell writing, ruled against the taxpayers and held that the county "had the right to use the bonds for paving the relocated portion of the Route No. 49," (the same as the Dixie Highway).

In Brimer v. Municipality of Jefferson City, 187 Tenn. 467, 216 S.W.2d 1 (1948), taxpayers sought to enjoin the city from participating with Jefferson County, the State Highway Department and the Federal Government in the costs of acquiring rights of way through the city for the relocation of the highway running from Knoxville to Morristown. The charter of Jefferson City gave the city full authority over streets to "grade, pave, or otherwise improve," streets "or have the same done." The taxpayer charged that relocation of the highway "is not for the city" and that the city should not be burdened with this expense. The court said:

"There is no merit in complainant's contention that a street which is within the corporate limits of a town loses its character as a city street, due to any work that may be done for its mainte-

nance, or its relocation by virtue of a contract between the municipality and the State Highway Department."

This court has also approved similar contracts, King v. City of Mobile, 273 Ala. 109, 134 So.2d 746.

We come now to consider some of the evidence before the trial court. The highway or expressway here involved is referred to as the Red Mountain Expressway, which would be an additional highway to U. S. 280 and U. S. 31 to help alleviate the congested traffic in south Birmingham over Red Mountain. This traffic was described by Commissioner Connor, Commissioner of Public Safety, as the worst traffic situation in Birmingham, and Commissioner Waggoner, who administered the Department of Public Improvements, including streets, testified that it was the number one traffic need in the city. Commissioner Waggoner also testified that the northern end of the expressway would be along the present alignment of 26th Street, that the construction of the access roads included in the Expressway Program would constitute an improvement to the streets and highways of the city and that some streets will be improved by the elimination of deadends, bad curves and grades.

These commissioners were called by appellants, and their expert witness, Engineer Hendon, who with others had prepared the Red Mountain Expressway Preliminary Engineering Analysis for the state, Jefferson County, Birmingham, Homewood, Mountain Brook and Vestavia Hills, and had formerly been County Engineer for Jefferson County, testified that efforts had been made since the middle 1930's to get a road across the mountain. He testified that the Expressway "is the most needed highway facility in the metropolitan area; second, it will in our judgment improve all the major streets south of there." He also said that probably the most effective way to improve a street was to lessen the traffic, and that the streets would be improved by eliminating grades and deadends. On redirect examination by appellants' counsel, he said

"I will not, Mr. Fulford, testify that the access roads do not improve the streets of Birmingham."

Appellees' expert, Engineer Schmied, who also participated in the study and preparation of the analysis, testified that the Expressway is designed in conjunction with the existing streets in Birmingham, that other existing streets could then function at desirable levels and carry excess traffic; that it formed a relief to existing streets; that the traffic level is expected to double by 1980; that access roads will connect several deadend streets and those roads become a permanent part of the street system, and these access roads improve all those deadend streets by connecting them where no useable streets exist now. He said, "We are building a new facility and we are improving existing streets." He testified in particular that U. S. 31 and U. S. 280 would be improved by the building of the Expressway and that approximately 8,000 linear feet of existing streets and alleys were included in the rights of way limits of the project; and that in his opinion "it definitely would be an improvement," both to the streets and from the improvement to the movement of traffic. We quote one statement of the witness:

"The improvement can be measured by what we term user benefits, and user benefits are developed by the cost of the project compared to the savings that the public can develop by means of being able to use an improved route or new route over the cost to them for using the old route. We have conducted user benefit studies within our project limits, and the savings that would accrue in that area just within the project far overshadow the expense in that section, so, while we can't say how much we are improving anything outside of the immediate Jefferson County area, we can say that we are improving streets within Birmingham many times more than the cost that we are proposing to spend for the improvement."

There was no testimony that the streets and highways in Birmingham would not be improved by the construction of the Expressway, and both lay and expert witnesses of both parties testified that the streets of the city would be improved by the construction of the Expressway.

The philosophy of this court on questions like the one here presented was stated by Dowdell, C. J., in Thomason v. Court of County Commissioners, 184 Ala. 28, 63 So. 87. There, the voters of Marshall County were to decide whether the county governing body "shall issue bonds in behalf of the county for the purpose of constructing, improving, and repairing the public roads of the county, * * *." The taxpayer sought an injunction because the notice of the election, as well as the order calling it, contained provisions not authorized by law, in that the words "improving and repairing" were used when the statute only used the word "constructing." The court said:

"The evident purpose of the statute (section 158 of the Code of 1907) was the development of the country, and highly beneficial in its nature and character, and should therefore receive a very liberal construction. It is true that there is a technical difference in meaning between the words 'constructing' and 'repairing' or 'improving.' But it cannot be doubted that the words *repairing* and *improving* in a sense are embraced within the idea conveyed by the word *constructing*. It is hardly to be supposed that it was the intention of the lawmakers, in authorizing the issuance of bonds for the *constructing* of the public roads, to require that such road should be constructed anew throughout. * * *

"All statutes should be construed with reference to the manifest purpose and intention of the lawmakers in their enactment, and such manifest purposes should not be defeated by a narrow construction based upon nice distinctions in the meaning of words. The word of the statute, *constructing,* is used in

the order for holding an election and in the publication of notice of the election, and the inclusion of the words repairing and improving, which in a sense are embraced in the word constructing, giving the statute in its objects and purposes a broad and liberal construction, should not vitiate the election."

In view of the cited authorities, we are constrained to hold that proceeds of the bond issues for the purpose of improving highways and streets in Birmingham, contemplates not only existing streets, but new streets and relocation of streets to provide for the future needs and growth of the city and any new street or highway built in the city which helps the flow of traffic and reduces traffic on congested streets improves the streets and highways of the city. We think the emphasis ought to be, not on the streets or highways themselves, but the usefulness to the inhabitants of the municipality, and the public. (We are not to be understood as even intimating that the proceeds of a bond issue for the improvement of a designated street or streets could be used for another street or other streets generally.)

In passing, we note that the record discloses that two other street projects, the 19th Street Underpass and a portion of the Georgia Road, were constructed out of the bond money, and in each instance, they were built on an entirely new right of way where no street or right of way ever existed. It is only fair to say that the record does not show that these projects were contested, although it is common knowledge that each made a tremendous improvement in Birmingham traffic.

We advert to one more principle. Each case for injunctive relief must be considered in the light of the rule that an injunction, whether permanent or temporary, cannot, as a general rule, be sought as a matter of right, but the power to grant or refuse it rests in the sound discretion of the court under the circumstances and facts of the particular case. Corte v. State, 259 Ala. 536, 67 So.2d 782; State ex rel. Gallion v. Simonetti, Inc., 270 Ala. 66, 116 So.2d 572.

The trial court did not abuse his discretion in denying the application for a temporary injunction.

In view of the application of this last stated principle, the other argued assignments of error need not be discussed.

The decree is due to be affirmed.

Affirmed.

SIMPSON, GOODWYN, MERRILL, COLEMAN and HARWOOD, JJ., concur.

LIVINGSTON, C. J., dissents.

LIVINGSTON, Chief Justice (dissenting).

It is clear to me that the construction of the proposed expressway would unquestionably be the construction of a "new" facility as opposed to the "improvement" of an old one. The testimony and exhibits make it abundantly clear that the new highway would utilize existing facilities only incidentally, and any "improvement" to the existing streets would be strictly secondary in nature.

In Wolff Chemical Co. v. City of Philadelphia, 217 Pa. 215, 66 A. 344, the Supreme Court of Pennsylvania was confronted with an issue strikingly similar to the one presently before us. In that case, a municipal bond issue was approved by the voters of the city "for continuing the improvement of the boulevard from Broad street northeastward." The city authorities then attempted to use the proceeds of the bonds to "open" the boulevard. In holding that the "improvement" of the boulevard did not include the "opening" of the boulevard, the court said:

"* * * we think it clear that the appropriation 'for continuing the improvement of the boulevard' was not in-

tended to be applied to the opening of the boulevard. 'Continuing the improvement of the boulevard' implies the prior existence of a boulevard, a change for the better in its condition, and that some progress had previously been made in bettering its condition when the city councils and the electors authorized the increase of the municipal indebtedness for the purpose. As tersely put by Grey, V. C., in Ames v. Trenton Brewing Co., 56 N.J.Eq. 309, 38 Atl. 858, 'in order that there might be an improvement, there must previously have been something to improve.' As long as the buildings occupied the site of the proposed boulevard and the damages due the property owners were unpaid or unsecured, there was no street to be improved. * * *"

The Pennsylvania Court went on to say that it was problematic whether or not a majority of the voters would have voted the funds to open the boulevard, saying:

"* * * It is one thing to present to a voter a proposition to increase an indebtedness for the purpose of continuing or completing a municipal improvement already in progress, and quite another thing to ask him to increase the debt of the city for the purpose of inaugurating a public improvement which will result in the expenditure of large sums of money. For obvious reasons, he might and probably would favor the first proposition; but he might have great hesitancy in supporting the latter. The purpose of the law in requiring full notice to the elector of the object of increasing the indebtedness is to enable him to vote intelligently and with a full comprehension of the purpose to which the money is to be applied. In casting his vote for or against the proposition, he is controlled by the purpose of the proposed increase as stated in the ballot furnished him by the city itself. Good faith and official integrity, therefore, require the city authorities to apply the fund thus placed in their hands strictly in accordance with the purpose for which it was voted. The language of the notice given the voter is that of the city councils, and, if there is any doubt in its meaning, it must be resolved so as to prevent the application of the fund to a purpose other than that for which the circumstances and the apparent intent of the electors intended it."

In the case of Harding v. Board of Supervisors of Osceola County, 213 Iowa 560, 237 N.W. 625, bonds were approved "for the purpose of providing the funds for draining, grading and hard surfacing the primary roads of the county." There were existing at the time of the approval of the bond issue, certain roads which bore the designation "primary roads." An attempt was made after the bond issue was approved to use the money provided for the paving of another road; presumably it would then have become a "primary road." In preventing the bond funds from being used for such a purpose, the Iowa court stated:

"When the voters voted in favor of the said proposition, they voted for the expenditure of the funds upon the then primary roads of the county, and not upon some road which might thereafter be substituted for the then primary roads of the county. * * *"

Another case in point is that of Marks v. Richmond County, 165 Ga. 316, 140 S.E. 880. In that case, a resolution was passed by the county board of commissioners specifying work that had been done on the highways of the county and calling for an election to approve a bond issue for "[p]aving with hard surfacing and improving the stretches of state highways traversing Richmond county." The bond issue was approved by the voters. Subsequently, the highway department relocated one of the routes in the county (laid out a new road), and adopted the new route as the official one. In disallowing the expenditure of the

bond money on the new route, the Supreme Court of Georgia said:

" * * * You cannot reduce grades, make fills, and eliminate curves in and from roads which have not been located, and which do not exist even on paper. The reference is to highways which traverse Richmond county. A highway which has no existence cannot traverse even Richmond county. In describing these roads the present participle, *traversing*, is used. Thus, by the facts stated and the language used in describing these highways, the clear and unmistakable reference is to roads already built, and not to roads yet to be built. * * * "

The cases of Thompson v. Town of Frostproof, 89 Fla. 92, 103 So. 118; City of Ft. Myers v. State, 95 Fla. 704, 117 So. 97; Thompson v. Pierce County, 113 Wash. 237, 193 P. 706; and State ex rel. Ramsey County v. Babcock, 186 Minn. 132, 242 N.W. 474, are of similar import.

Counsel for the appellees has ably attempted to distinguish all of the above-cited cases from the case at bar. Admittedly, some of them do differ in some respects from the present case. I am convinced, however, that the rationale of those cases is logical and sound and should be followed. Appellees rely strongly on the case of Meyering v. Miller, 330 Mo. 885, 51 S.W.2d 65. There, a proposition was submitted to the voters of the City of St. Louis proposing certain bonds, the proceeds of which were to be used "[f]or the acquisition of land and the construction of additions and extensions and equipment of public hospitals * * *." Action was brought to prevent the city from using the proceeds of the bonds thus authorized for the construction of a new hospital. The Supreme Court of Missouri allowed the bond funds to be so used. One unique factor was present in that case, however. It appears from the report of the case that while it did not appear on the ballot that the funds would be used in part for a new hospital, the electorate was apprised of this fact before the election. Thus, it might well be said that the voters of St. Louis did approve of the use of the bond funds for construction of an entirely new facility. The same cannot be said of the instant case, for while the Red Mountain Expressway had been under consideration for some time, there is no evidence that the general public understood that it would be included in the bond issue here under consideration.

Appellees contend that the existing streets of Birmingham would be improved by the proposed expressway because it would reduce traffic on them and hence lessen wear. While this may be technically true, it is clear to me that this is not an "improvement" within the intended meaning of the word as used in the proposal here being construed. It appears to me that when the average voter read the word "improvement," he thought of a physical addition to or modification of a street, such as paving, grading, etc., not a mere lessening of use.

The rule of law argued by appellees that the appellate court will not reverse the judgment of a municipal body having discretionary powers unless the action of such body is fraudulent or corrupt, has no application in this case. In my judgment, the city had no discretion to use the bond funds for an unauthorized purpose.

It is my conclusion that the decree of the trial court was laid in error and should be reversed. I, therefore, respectfully dissent.