No. 19,678.

CITY AND COUNTY OF DENVER, ET AL. *v.*
THOMAS G. CURRIGAN, ET AL.
(362 P. [2d] 1060)

Decided June 26, 1961.

Mr. DONALD E. KELLEY, Mr. EARL T. THRASHER, Mr. HANS W. JOHNSON, for plaintiffs in error.

Messrs. GORSUCH, KIRGIS, CAMPBELL, WÁLKER and GROVER, Mr. BEN KLEIN, for defendant in error Thomas G. Currigan.

Messrs. CREAMER & CREAMER, for defendant in error Charles Ginsberg, and Mr. Charles Ginsberg, pro se.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

THE parties are here in the same order they appeared in the trial court. We will refer to plaintiffs in error by name, as plaintiffs or as the City, and to the defendants in error by name or as defendants.

The action was commenced to obtain an order requiring defendant Currigan, as Auditor of the City and County of Denver, to execute, register and countersign a certain contract which had been submitted to him. The trial court refused to enter such an order. The present proceedings were initiated to review the ruling of the trial court.

The plaintiffs are the City and County of Denver, a municipal corporation, and W. J. Shoemaker, Manager of Public Works. When the action was commenced R. Y. Batterton was the Manager of Public Works. He subsequently was elected Mayor and replaced by L. M. Cooley. Mr. Cooley, in turn, resigned and Mr. Shoemaker is now the present Manager of Public Works.

During the pendency of the action, Charles Ginsberg was authorized to intervene and participate in the trial.

The dispute arose out of the following circumstances:

At a special municipal election held on May 17, 1955, a substantial majority of the electorate approved and authorized the issuance of three series of municipal gen-

eral obligation bonds. The election had been called and all details concerning these bonds had been fixed by Ordinance No. 81, Series of 1955 of the City and County of Denver. By this ordinance three proposals were submitted for the issuance of as many bond issues. Each proposal was voted upon separately. The first proposal related to bonds in the sum of $8,700,000.00 to be issued for streets and traffic control; the second to parks and recreational facilities, and the third to a sanitary sewer system. We are concerned only with the first proposal, i.e., those bonds relating to streets and traffic control, and our comments relate only thereto. By Ordinance No. 81, Series of 1955, the proceeds from the sale of these bonds were to be expended in a manner set forth in the ordinance which first provided for a group of fifteen specific public improvements. The ordinance then provided that:

"WHEREAS, *in the event the accomplishment* of the program detailed in the preceding recital *does not exhaust the bond proceeds* allocated thereto, *then any balance may be* applied to the accomplishment of all or a part of the following:" (Emphasis supplied.)

Then was set forth a group of five additional specific public improvements.

Fourteen of the fifteen enumerated public improvements constituting the first group have been constructed and completed in their entirety. After this construction there remains unexpended the sum of $1,700,000.00. The remaining public improvement of the first group which has not been constructed was described in the ordinance as follows:

"5. Construction of a 15th Street Viaduct over railroad tracks between Bassett Street and Wazee Street."

After the passage of the ordinance and upon inquiry, both the Mayor and the Manager of Public Works concluded that the construction of the authorized viaduct was undesirable; in fact, they contend it would create a public hazard and amount to a waste of public moneys.

Accordingly, acting in the exercise of an alleged official discretion vested in them, these officials decided that the construction of the viaduct should be abandoned, and in lieu of the viaduct substituted, to the extent of available funds, one of the five specific public improvements enumerated in and constituting the second group, which was described in the authorizing ordinance as:

"1.a. Widen University Boulevard from 1st Avenue to Alameda Avenue to 6 lanes."

The city then proceeded to enter into a contract with E. B. Horton, Jr., for his services in appraising the value of the land to be acquired under the substituted project. It is this agreement that was submitted to defendant Currigan for registration and countersigning as provided by the Municipal Charter. This he refused to do, giving as his reason therefor in a letter to the Mayor dated October 21, 1959, that available funds could not be used for constructing an improvement enumerated in the second group until all of the improvements constituting the first group had been constructed in full. Contending that the refusal of the Auditor was unlawful, the present action was commenced.

It is conceded by all parties to the action that in the event of *literal impossibility* of performance the city may abandon any of the first fifteen projects. There agreement ceases. The city contends this is such a case and that in such event it may choose any of the additional five projects. Defendant contends this is not such a case, but even if it were that the wording of Ordinance No. 81 does not vest discretion in the city officials to do any other construction work with the funds voted for the now abandoned project. This is the real issue in the case and we believe the defendants' position to be correct.

The record shows that prior to the bond election the city, through its city engineer, knew that the proposed viaduct could not be brought down to grade at Bassett Street and that if proper clearance were to be maintained there would be engineering difficulty in terminating the

viaduct at Wazee Street. Further, that it is structurally feasible to build it if extended one block to the north and one block to the south. The two principal problems posed by the city are:

(1) That on the north there is a bridge constructed about 1880 that would not fit into the city traffic plans as developed after the election, resulting in traffic hazards and bottlenecks. This fault in the proposal must or should have been known to the city and the voters when the project was adopted. In fact, the city traffic engineer testified that he knew at the time of the bond election that the viaduct could not be feasibly operated but assumed that some other funds would be made available to take care of the bridge problem; and

(2) That the state now desires arterial type construction of its own in the area and this viaduct should be built to conform therewith. The latter of course shows a realistic analysis of the traffic problems, current and future, by the city but may not be utilized to foil the will of the people who authorized their money to be spent in a specific way.

The pertinent findings of the trial court in regard to these matters were:

"The evidence is before the court that the viaduct can be built, that it will cover the tracks mentioned in the ordinance between the two streets mentioned, and that it will make a crossing of what the mayor called a maze of tracks much easier and much more convenient for the public.

"The city asks the court to make a finding that the building of this viaduct is unnecessary, undesirable, wholly (sic) improper diversion of public money and a waste of public money. The reasons the city apparently doesn't want now to construct this viaduct or they think, so the testimony is, that they are limited by the ordinance to the two streets as the terminal points of the viaduct, Wazee at one end and Bassett Street at the other. The evidence is that it would require an incline

of a gentle slope at one end to get off the viaduct and take it beyond Wazee Street and up to Blake Street which would make it about a block beyond the point mentioned in the ordinance. At the other end the city claims, because of the existence of a bridge which is beyond Bassett Street, as I understand it and not between these two streets at all, that because of that the bridge must stay the way it is, the viaduct would be a bad thing; unnecessary. It wouldn't work. And yet the city says that the city fathers, the officers of the city, had the right, the discretion to simply say, 'Well, we don't want to build this viaduct because of these engineering problems and thinks (things) that have come up since and we have a discretion therein to jump to the second group and use the money for that; but we have no discretion at all to extend the viaduct for a couple of blocks at one end to make the approach feasible and to do something maybe to the bridge at the other end.' That seems to me rather an inconsistent position that the city has taken.

"Without making a definite finding in the matter, it seems to me that the court would be justified in making a finding, if it was directly put up to the court, that the designing engineers of the city, if they thought it was feasible and best engineering practice to extend both ends of this viaduct a little beyond these two streets that that would be within their discretion under the ordinance.

"As a matter of public relations involved here, which is perhaps not a matter for the court to decide as a judicial determination, but certainly vests on me, if the city is permitted to recover in this suit and to have the court make the determination which they ask the court to do, I think it would be very difficult in the future to get the public to ever vote a bond issue. A voter could say with every justification, if this case is decided in favor of the city, 'Why should we vote for the city to have several million dollars to make certain improvements when

they can turn around after the ordinance is passed and use the money for something else? Why should we vote for it? We just won't.' It seems to me that would be a serious problem presented to the city in this action, if they should prevail in this action.

"I think the court, in this case, is not required to tell the city to build this viaduct. I am very sympathetic of the attitude of the city and its officials who have appeared before the city (court) as to why they haven't built it. And I don't think they are going to ask the court to require the city to build a viaduct even if the city loses this case. The point now is shall the court direct the city and authorize the city to use this money for something else. That is quite different from saying, 'Shall we build the viaduct?' The cases hold that a project can be abandoned. That doesn't necessarily mean the money they were going to use for that project could be used for something else; just because they abandon one of them they still have the money, the money devoted to some other project entirely apart from this. It could perhaps be invested, perhaps could be used to retire the bonds. I don't know. I don't think it is the function of this court to tell the city what to do with the money. Asking the court, however, to direct and authorize the expenditure of these funds in a manner which I think is entirely beyond the authority of the city to do under the circumstances."

■ The learned trial judge was indeed correct in his analysis of the evidence and the problems involved. In *McNichols v. Denver* (1949), 120 Colo. 380, 391, 209 P. (2d) 910, it was said:

"Finally it is urged that the city has a reasonable discretion in use of the proceeds of the bonds. This is true, but a use for a purpose other than that authorized by the voters is not within the range of reasonable discretion."

What the city fails to recognize is that the material departure it proposes from the terms of its own ordi-

nance, even for a project named therein, would constitute an unlawful diversion of voter approved trust funds and not *vice versa* as it contends. See *Harding v. Bd. of Supervisors* (1931), 213 Iowa 560, 237 N.W. 625 (unlawful diversion); and *Marks v. Richmond County* (1927), 165 Ga. 316, 140 S.E. 880 (particular purpose bond funds are trust funds). The terms of particular purpose bond issues must be strictly complied with. *Tukey v. City of Omaha* (1898), 54 Neb. 370, 74 N.W. 613.

It is urged that the ruling sought here is analogous to the charitable doctrine of *cy pres*. Under it, when the purposes of a trust cannot be carried out a court of equity may make such modifications and alterations in charitable bequests — otherwise impossible of exact execution — as are consistent with the testator's intent. The doctrine is usually limited to cases where a general charitable intent is disclosed, and denied where a narrow and exclusive one is indicated. Even *cy pres* would not permit the substitution of one project (i.e. charity) for another where, as here, the original purpose could in fact be accomplished. See *Fisher v. Minshall, Administrator* (1938), 102 Colo. 154, 78 P. (2d) 263, and *Moore v. Denver* (1956), 133 Colo. 190, 292 P. (2d) 986.

■ Here the trial court properly found that it is not legally impossible to carry out the voters' mandate. The only doubt expressed was as to whether it is now wise or expedient. In such circumstances abandonment is the remedy, not another project which can legally come into being only when conditions precedent thereto have been met.

The fact, as urged by the city, that its officials have the sole management and control of public improvements can have no bearing. Such authority relates to *how* projects will be built, *not what* shall be built, or to substitute projects in disregard of priority as determined by the voters.

■ The trial court's holding is not an interference with the discretionary powers of elected officials as

urged by the city. If the city had desired the discretionary power contended for here by interpretation of the ordinance, it would indeed have been a simple matter to have so worded the ordinance before its submission to the electorate. This it chose not to do and cannot now by hindsight have a judicial amendment of its mandate. There can be no "balance" available for the alternate projects unless *all* of the priority ones have been accomplished as expressly provided by the ordinance in question.

We conclude, therefore, that the projects are not interchangeable and that the priority called for in the ordinance must either be adhered to or the project abandoned.

The judgment is affirmed.

MR. JUSTICE DOYLE not participating.