STATE EX REL. STATE GENERAL OBLIGATION BOND COMMISSION, RELATOR, v. JOHN KOONTZ, SECRETARY OF STATE, RESPONDENT.

No. 5486

COLORADO RIVER COMMISSION OF NEVADA, PETITIONER, v. THOMAS R. RICE, SECRETARY OF THE COLORADO RIVER COMMISSION OF NEVADA, RESPONDENT.

No. 5487

February 8, 1968      437 P.2d 72

*Russell W. McDonald* and *Frank W. Daykin,* of Carson City, for State General Obligation Bond Commission.

*Harvey Dickerson,* Attorney General, and *Robert A. Groves,* Deputy Attorney General, of Carson City, for John Koontz, Secretary of State.

*Robert E. Jones,* of Las Vegas, for Colorado River Commission.

*Toy R. Gregory, Jr.,* of Las Vegas, for Thomas R. Rice, Secretary of the Colorado River Commission.

## OPINION

By the Court, MOWBRAY, J.:

These cases concern the effect of the state debt limit upon the financing of a facility for the treatment of water from the Colorado River for use in the metropolitan area of Las Vegas.

Since its adoption, the Constitution of this State has imposed a limit upon the amount of debt which the Legislature may contract. The general limitation, originally $300,000, was

amended to its present form in 1916, and appears as the first paragraph of the debt limit section as printed in the margin.[1]

The second paragraph was added in 1934. It was designed to enable the State to take over and put to beneficial use the electric power allotted to it from the Boulder Canyon project, now Hoover Dam.

Meanwhile, the rights to another resource, even more vital in the desert Southwest, were being determined: the waters of the Colorado River. Five times, beginning in 1930, litigation came before the Supreme Court of the United States. The last case, begun in 1952 and lasting 12 years, decreed to the State of Nevada, subject to certain conditions, the right to consume 300,000 acre-feet of that water annually. Arizona v. California, 376 U.S. 340 (1964).

The decision came at an opportune moment. The metropolitan area of Las Vegas had since World War II experienced an explosive growth in population. Its natural water resources were those of the artesian basin in which it lies. By 1964, it was estimated that water was being withdrawn from the artesian reservoir at a rate 50 percent greater than the rate of input. To meet this situation, the Congress of the United States

---

[1] Nevada Constitution, art. 9, § 3. "The state may contract public debts; but such debts shall never, in the aggregate, exclusive of interest, exceed the sum of one per cent of the assessed valuation of the state, as shown by the reports of the county assessors to the state controller, except for the purpose of defraying extraordinary expenses, as hereinafter mentioned. Every such debt shall be authorized by law for some purpose or purposes, to be distinctly specified therein; and every such law shall provide for levying an annual tax sufficient to pay the interest semiannually, and the principal within twenty years from the passage of such law, and shall specially appropriate the proceeds of said taxes to the payment of said principal and interest; and such appropriation shall not be repealed nor the taxes postponed or diminished until the principal and interest of said debts shall have been wholly paid. Every contract of indebtedness entered into or assumed by or on behalf of the state, when all its debts and liabilities amount to said sum before mentioned, shall be void and of no effect, except in cases of money borrowed to repel invasion, suppress insurrection, defend the state in time of war, or, if hostilities be threatened, provide for the public defense.

"The state, notwithstanding the foregoing limitations, may, pursuant to authority of the legislature, make and enter into any and all contracts necessary, expedient or advisable for the protection and preservation of any of its property or natural resources, or for the purposes of obtaining the benefits thereof, however arising and whether arising by or through any undertaking or project of the United States or by or through any treaty or compact between the states, or otherwise. The legislature may from time to time make such appropriations as may be necessary to carry out the obligations of the state under such contracts, and shall levy such tax as may be necessary to pay the same or carry them into effect."

authorized the Secretary of the Interior to construct the Southern Nevada Water Project,[2] by which Colorado River water will be diverted from Lake Mead and transported to places of public use within Clark County at an estimated cost of $52,-000,000. A single link remained to be forged: a means of treating this water to make it potable and thus suitable for domestic use.

The Nevada Legislature responded by authorizing the Colorado River Commission of Nevada to issue bonds in an amount not to exceed $10,000,000 to build such a treatment plant.[3]

In Case No. 5487, the Colorado River Commission, pursuant to this enabling act, adopted a resolution to sell the bonds and directed its secretary to give notice of the sale to prospective bidders.

The secretary refused, challenging the validity of the proceedings on two grounds: (1) That the amount of the bonds would exceed the state debt limit and (2) that the repayment provisions (a) exceed the 20-year limit[4] and (b) require the levy of taxes only generally and authorize the use of other moneys for the payment of principal and interest.[5]

The Commission, contending that both the amount and the repayment of the bonds are within the terms of the second paragraph of section 3 of article 9 as quoted above, applied to this court for a writ of mandate to require the secretary to give notice.

In Case No. 5486, the State General Obligation Bond Commission, acting after the adoption of the resolution to issue the Colorado River bonds as stated above, resolved to sell $50,000 worth of general obligation improvement bonds previously authorized by the Legislature,[6] and directed the Secretary of State to give notice of the sale to prospective bidders. The Secretary of State refused, on the grounds (1) that these bonds, if issued in addition to the Colorado River bonds, would be in excess of the State debt limit and (2) that the enabling act provides for the diminution of the tax levied for repayment of the bonds to the extent of their repayment from other moneys made available.

The Commission seeks a writ of mandate to compel the

---

[2]79 Stat. 1068 (1965), *as amended,* 80 Stat. 312 (1966).

[3]Stats. Nev. 1967, ch. 268.

[4]In fact they extend to 40 years.

[5]Revenues of the project are pledged as "additional security" and, in fact, as was stated in argument, are relied on to service the bonds.

[6]Stats. Nev. 1967, ch. 520.

giving of the notice. The issue raised by its contentions are discussed at length below.

Because of the close relationship of the issues and the public importance of a speedy decision, we consolidated the cases for argument.

All parties agree that the outstanding debt and debt limit of the State are substantially as set forth in the affidavit of the State Controller, filed in Case No. 5486 as follows:

| | |
|---|---:|
| Outstanding general obligation bonded indebtedness September 1, 1967...... | $8,442,000.00 |
| Additional bonds authorized by the 1967 Legislature—sold September 12, 1967............................................. | ............................ |
| General obligation bonds pursuant to chapter 520, Statutes of Nevada 1967, page 1393.............................. | 4,085,000.00 |
| Total bonded indebtedness, outstanding and sold............................................. | $12,527,000.00 |
| 1967 assessed valuation......... $1,479,572,673.00 | |
| Limitation: 1 percent.............................. | $14,795,727.00 |
| Outstanding and sold on September 12, 1967................................................. | 12,527,000.00 |
| Balance—unused limitation, September 12, 1967................................................. | $2,268,727.00 |

Both respondents likewise concede the appropriateness of the remedy. Marlette Lake Co. v. Sawyer, 79 Nev. 334, 383 P.2d 369 (1963); City & County of San Francisco v. Linares, 106 P.2d 369 (Cal. 1940).

The first issue to be resolved is whether the bonds whose issuance is proposed by the Colorado River Commission fall within the exemption provided by the second paragraph of the debt limit. This court held in Marlette Lake Co. v. Sawyer, supra, that a water supply is one of the natural resources of the State, and that the exemption extends to all natural resources found within the geographical limits of Nevada. We are not convinced by respondent's argument in Case No. 5487 that a specified amount of the waters of a boundary river cannot be definitely located as within this State. If the intake is within this State, the waters taken must come within this State to reach it.

The subsidiary issue of the propriety of the repayment provisions of the Colorado River bonds then turns on the meaning of the words, "notwithstanding the foregoing limitations," which introduce the second paragraph. We hold that these words apply to all the limitations formed in the first paragraph: the amount of debt, the term for which it may be contracted, and the requirement of a specific tax appropriated for its repayment. The last sentence[7] would otherwise be superfluous, if not inconsistent.

The third issue is whether, after the Colorado River bonds have been issued, there remains any unused debt limitation against which the $50,000 worth of ordinary state general obligation bonds can be issued. The question is essentially one of classification. Both ordinary and "natural resource" debt may constitute a single class, which is permitted to exceed the debt limit only if the last added amount which produced the excess was "natural resource" debt; or ordinary debt may constitute one class, which may be incurred up to the 1 percent limit, while "natural resource" debt constitutes a separate class, which may be incurred without limitation as to amount.

The concept of separate classes of state debt is not new in Nevada; the territorial debt assumed was expressly made a separate class by section 7 of article 17 of the Constitution. Under a former provision of the California Constitution, which imposed a money limit upon ordinary debt but permitted debt in excess of that amount to be incurred if approved by vote of the people, the Supreme Court of that state held that debt so approved constituted a separate class whose existence did not preclude the incurring of ordinary debt within the money limit. Bickerdike v. State, 78 P. 270 (Cal. 1904).

The same result is reached in all of the factually similar cases brought to our attention which have construed similar provisions with respect to municipal debt. For example, in Buntman v. City of Phoenix, 255 P. 490, 492 (Ariz. 1927), the court explained the two possible constructions (essentially as set forth in the preceding paragraph, except that the debt limit was 4 percent) and said:

"We are of the opinion that the latter construction is more consonant with reason and the presumable spirit and purpose

---

[7]"The legislature may from time to time make such appropriations as may be necessary to carry out the obligations of the state under such contracts, and shall levy such tax as may be necessary to pay the same or carry them into effect."

of our Constitution. The construction first set forth would mean that, should a city incur an indebtedness of 4 per cent. for special enterprises * * * it could never become indebted for any other legitimate municipal purpose unless and until the total indebtedness, including that for * * * [special enterprises], was reduced below the 4 per cent. Such a construction would greatly limit and hamper our municipalities in the performance of their legitimate duties."

In Rice v. City of Watertown, 281 N.W. 116, 117 (S.D. 1938), where two exceptions had been added by amendment to an original limit, the court found "three independent and mutually exclusive limitations." The court explained its holding thus:

"Such [the contrary] interpretation would convict the Legislature which proposed the amendments and the people who adopted them of the improbable and unreasonable intention of rendering the debt limitation * * * dependent upon an insignificant circumstance, namely the order in which it [a city] had incurred the several debts."

We concur in the reasoning of these decisions, and we hold that the bonds proposed to be issued by the Colorado River Commission (together with the Marlette Lake bonds and any others which may be issued under the exemption of the second paragraph debt limit section) will constitute a separate class of debt.

Therefore, ordinary state general obligation bonds, including those proposed to be issued in Case No. 5486, may be issued up to the full amount of 1 percent of the assessed valuation of the State.

In so holding, we wish not to be understood, as was suggested in argument, as holding that any bonds issued for any purpose enumerated in the second paragraph automatically constitute part of this separate class. We believe that the words, "pursuant to authority of the legislature," make the exemption discretionary. The Legislature may, therefore, initially issue bonds for such purposes as ordinary debt within the 1 percent limit, if it so chooses.

We turn to the last issue presented, which concerns the mandatory repayment provisions for ordinary state general obligation bonds. The enabling act for the issuance of the bonds which are the subject of Case No. 5486 adopts by reference the provisions of sections 45 to 51, inclusive, of the

State Securities Law,[8] and it is these sections with whose validity we are concerned. These sections provide in relevant part for (1) payment of principal and interest from the Consolidated Bond Interest and Redemption Fund pursuant to NRS 349.080–349.140, (2) levy of an annual tax sufficient to provide for such debt service, and (3) the use of any other available revenue for such debt service and the corresponding diminution of the special tax. The Secretary of State objects to provision (3), which the State General Obligation Bond Commission concedes is inconsistent with a literal reading of certain words at the end of the second sentence of the first paragraph of the debt limit section: "nor [shall] the taxes [be] postponed or diminished until the principal and interest of said debts shall have been wholly paid."

The court must, however, look to the entire sentence and construe each clause in the light of the purpose of the whole. That purpose clearly is to avoid default upon the State's obligations. This purpose can be as well served, if not better, by the use of moneys from more than one source. Therefore, a construction which would confine the source of debt service on general obligation bonds to ad valorem taxation would frustrate, rather than further, the fundamental purpose. Nor is there reason to suppose that the framers of the Constitution intended so to narrow the source, as a matter of deliberate choice. "Double-barreled" repayment provisions, which couple a pledge of ad valorem tax revenues with a conditional or unconditional pledge of other revenues, are a modern development. The language at the end of the opinion in State ex rel. Nightingill v. Bd. of Comm'rs, 1 Nev. 264 (1865), contemporaneous with the Constitution, indicates an automatic recourse to ad valorem taxation without consideration of other means of servicing state debt.

In this situation, there is precedent for not construing the specification of an ad valorem tax as precluding other sources. The Supreme Court of the United States, in Cohen v. Virginia, 19 U.S. 264 (1821), held (at page 395 of the lengthy opinion) that although affirmative words may imply a negative or exclusive sense, where they have full operation without it, or where a negative or exclusive implication would destroy an important object of the provision, "affirmative words ought not to be construed negatively." The Supreme Court of New Jersey, in Reilly v. Ozzard, 166 A.2d 360 (N.J. 1960), explained the rule of construction as follows:

---

[8]Stats. Nev. 1967, ch. 267, §§ 45–51.

"We see no basis to invoke the maxim, *expressio unius est exclusio alterius*. The maxim at best is a mere aid to interpretation. Perhaps more accurately, it usually serves to describe a result rather than to assist in reaching it. The final question is whether in a given context an express provision with respect to a portion of an area reveals by implication a decision with respect to the remainder. The issue is one of intention. The answer resides in the common sense of the situation. A constitution does not resolve all policy problems. Rather it establishes the framework of government with such specific restraints as are thought to be of eternal value and hence worthy of immunity from passing differences of opinion."

In fact, there has been a gradual evolution in the concepts of state debt service in Nevada over a period of many years. In 1939, the Legislature created the Consolidated Bond Interest and Redemption Fund and pledged to it the revenues of the Liquor License Law and such additional ad valorem tax as might be necessary.[9] This departed from the concept of the sole property tax, and contravened the literal requirement of a special tax "specially appropriated" to the payment of each bond issue.

In 1957, the Legislature repealed both the liquor and the property tax provisions, and provided for replenishing the Consolidated Bond Interest and Redemption Fund by appropriation from the General Fund.[10]

In 1961, the Legislature authorized an issue of bonds, to be serviced from the Consolidated Bond Interest and Redemption Fund, without provision for any special tax.[11]

These statutes represent a continuing construction by the Legislature which, while adhering to the fundamental purpose of the restriction, has adapted its details to modern practice. Obviously, this construction was not contemporaneous with the adoption of the original constitutional provision, but this court has previously, in Marlette Lake Co. v. Sawyer, supra, attached significance to a legislative construction of the second paragraph without the requirement of contemporaneity. We therefore find no violation of the Constitution in sections 45 to 51 of the State Securities Law.

Two caveats are in order. Counsel in briefs and argument brought to our attention the holding of State ex rel. Nightingill

---

[9]*Stats. Nev. 1939, ch. 197.*

[10]*Stats. Nev. 1957, ch. 162. See NRS 349.120.*

[11]*Stats. Nev. 1961, ch. 357, § 12.*

v. Bd. of Comm'rs, supra, that none of the procedural requirements of the first paragraph apply to ordinary debt. We expressly overrule this holding of that case, for it finds no support in a reasonable reading of the successive sentences. Nor do we approve any relaxation of the mandatory ad valorem tax requirement beyond that found in sections 45 to 51 of the State Securities Law. Tax levies for debt service may be consolidated and the tax may be diminished only to the extent of actual payment from other sources.

We conclude, therefore, that each of the proposed bond issues is constitutionally permissible, and each respondent has a mandatory duty to give the required notice.

It is the order of this court that the peremptory writs of mandate issue.

THOMPSON, C. J., COLLINS, ZENOFF, and BATJER, JJ., concur.