FRIENDS OF CHAMBER MUSIC, a Non-Profit Corporation, for Itself and All Others Similarly Situated, Suzanne W. Joshel, and Kevin Markey, for Themselves and All Others Similarly Situated, Plaintiffs-Appellants and Cross-Appellees,

v.

CITY AND COUNTY OF DENVER; The Board of Council, City and County of Denver, and the Members thereof; M.R. Licht, City Auditor, City and County of Denver; Thomas P. Briggs, Manager of Revenue, City and County of Denver; and Martha Guevara, Manager of Parks and Recreation, City and County of Denver, Defendants-Appellees and Cross-Appellants.

No. 83SA185.

Supreme Court of Colorado, En Banc.

Feb. 25, 1985.

Edward H. Sherman, G. Kevin Conwick, Donald J. Hopkins, A. Edgar Benton, Holme Roberts & Owen, Denver, for plaintiffs-appellants and cross-appellees.

Stephen H. Kaplan, City Atty., Donald E. Wilson, Asst. City Atty., Denver, for defendants-appellees and cross-appellants.

DUBOFSKY, Justice.

The plaintiffs, Friends of Chamber Music, Suzanne W. Joshel and Kevin Markey, appeal a district court decision that upheld an ordinance adopting a Facilities Development Admissions Tax (admissions tax) to

retire municipal bonds issued by the City and County of Denver (Denver) for improvements to Mile High Stadium. Denver cross-appeals, challenging the standing of plaintiff Friends of Chamber Music and the certification of this case as a class action. We affirm the judgment of the district court, but rule that Friends of Chamber Music does not have standing as a tax collector to pursue its claim and that the members of the ticket purchaser class certified by the district court cannot be bound by this judgment because they did not receive adequate notice.

On July 15, 1974, the Denver City Council (council) enacted an ordinance calling for an election on the issuance of two sets of general obligation bonds. Denver, Colo., Ordinance No. 480, Series of 1974. The first question to be submitted to the voters authorized Denver to issue $22,000,000 worth of bonds for the improvement of Mile High Stadium. The second question authorized the issuance of an additional $2,500,000 in bonds to refinance outstanding municipal stadium revenue bonds. Each of the questions indicated that the bonds were "to be payable from general ad valorem taxes." *Id.* § 2. At the time the ordinance was adopted, the Denver Charter provided that the money necessary to retire bonds could come from property taxes "or other sources as specified by ordinance." Denver, Colo., Charter, § A6.11 (as amended May 15, 1973). The ordinance calling for the election erroneously relied on language in an earlier version of the charter stating that "the amount required to pay the interest on the bonded indebtedness and provide for the sinking fund shall always be provided for out of the tax on property." *Id.* § 4.

On August 26, 1974, before the electorate voted on the new bonds, the council adopted an ordinance imposing the "Facilities Development Admissions Tax," a tax of forty cents on admission to any event held at a city facility. The ordinance provided that vendors of admissions to events held at city facilities would be responsible for returning the tax to the city. The purpose of the tax as defined by the ordinance was "for the payment of the principal and interest due on any bonds issued in accordance with the proposition submitted to the electorate September 10, 1974, by Ordinance 480, Series of 1974, and for the payment of the expenses of operating and improving the city and its facilities; ..." Denver, Colo., Ordinance No. 590, Series of 1974 (codified as amended at Denver, Colo., Revised Municipal Code § 53–343 (1982)).

At the September 10 election, the voters approved the bond submission questions. Accordingly, on November 11, 1974, the council enacted two ordinances issuing the two sets of bonds. Denver, Colo., Ordinance Nos. 727, 742, Series of 1974. The stadium refinancing bond ordinance specified:

> All of the 1974 bonds, as the principal thereof and the interest thereon ..., shall constitute general obligations of the issuer, which hereby pledges its full faith and credit for their payment. The bonds as to all Bond Requirements shall be payable from General Taxes as herein provided.

Denver, Colo., Ordinance No. 727, Series of 1974 § 7. The Mile High Stadium improvement bond ordinance contained essentially the same provision. Denver, Colo., Ordinance No. 742, Series of 1974 § 6. The second ordinance, which provided for the issuance of bonds authorized for several different projects in addition to the stadium, specifically provided that direct taxes on property could be levied to pay the interest and principal on the bonds but also reserved the power to pay off the bonds with funds derived from other sources. *Id.* § 21.

Meanwhile, on October 29, 1974, the council had amended the admissions tax ordinance to require a tax of ten percent on the admissions to each event at a public facility instead of the forty cent per admission tax. Denver, Colo., Ordinance No. 716, Series of 1974. Several later ordinances made minor changes in the admissions tax, particularly revising the expressed purpose of the tax to specify that

surplus funds should be used for improvements and maintenance of other public facilities. None of these amendments, however, significantly changed the form of the tax or the fact that it primarily was to be used to pay off the stadium bonds.

The admissions tax became effective January 1, 1975. In December 1976, Friends of Chamber Music filed a complaint in the District Court for the City and County of Denver alleging that the admissions tax was unconstitutional and unlawful. Friends of Chamber Music is a nonprofit organization that has rented Phipps Auditorium, a city facility, for presentation of chamber music concerts. Friends of Chamber Music is a vendor for purposes of the admissions tax and must collect and return the ten percent tax to Denver's Department of Revenue. The complaint was later amended to add as plaintiffs two individuals who had attended events at Denver facilities and paid the tax. The suit was brought as a class action on behalf of two classes: vendors and purchasers of admissions to events at Denver facilities. The plaintiffs requested class certification under C.R.C.P. 23(b)(1), (2) and (3).[1] On April 3, 1979, the district court certified the plaintiff classes under C.R.C.P. 23(b)(3).[2]

The district court held a hearing to determine what form of notice would meet the requirements of C.R.C.P. 23(c)(2), which requires that notice be given to all the members of a class certified under C.R.C.P. 23(b)(3), allowing them the opportunity to opt out of the class and avoid being bound by the court's judgment.[3] The court found

---

1. C.R.C.P. 23, identical to the federal rule, requires that a class action must meet all of the requirements of C.R.C.P. 23(a) and the requirements of any one of three subsections of C.R.C.P. 23(b). C.R.C.P. 23(a) provides:

 One or more members of a class may sue or be sued as representative parties on behalf of all only if: (1) The class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

2. Any action may be maintained as a class action if the prerequisites of C.R.C.P. 23(a) are satisfied, and in addition, under C.R.C.P. 23(b):

 (3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:
 (A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;
 (B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
 (C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;
 (D) The difficulties likely to be encountered in the management of class action.

3. C.R.C.P. 23(c)(2) provides:

 In any class action maintained under subsection (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that:
 (A) The court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

 Notice to members of the class is not required if the class is certified under C.R.C.P. 23(b)(1) or (b)(2). Those subsections provide:

 (b) Any action may be maintained as a class action if the prerequisites of [C.R.C.P. 23](a) are satisfied, and in addition:
 (1) The prosecution of separate actions by or against individual members of the class would create a risk of:
 (A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or
 (B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest; or
 (2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;

that to meet the C.R.C.P. 23(c)(2) requirements of "the best notice practicable under the circumstances, including individual notice to all [class] members who can be identified through reasonable efforts," the plaintiffs should give personal notice by mail to all the members of the vendor class,[4] to all season ticket holders who could be identified through vendor mailing lists,[5] and constructive notice through newspaper publication to the members of the ticket purchaser class.[6] The court excluded from the ticket purchaser class all those who were exempted from paying the admissions tax and all those who attended events at Mile High Stadium.

Accordingly, the court ordered: (1) individual notice to all vendors except those who held events at Mile High Stadium; (2) individual notice to purchasers who were season ticket holders or subscribers to events held at Denver facilities other than Mile High Stadium, by voluntary inclusion of the notice in vendor mailings to those season ticket holders or subscribers; and (3) published notice in the Rocky Mountain News and Denver Post, with one notice to go in the sports section of one newspaper and one in the entertainment section of the other newspaper. The plaintiffs complied with the court's order and requested that all vendors notified include a notice of the class action in one of their mailings to their season ticket holders or subscribers. Most of the vendors, however, refused to include the notice.[7]

All evidence at trial consisted of stipulations and exhibits. The district court held that the enactment of the admissions tax was not an illegal alteration of the method of payment specified by the voters in approving the stadium bonds. The court determined that the submission to the voters indicating that the bonds would be payable from ad valorem taxes was necessary to the authorization of general obligation bonds, but did not limit the source of funds for the bonds to ad valorem taxes. The court also ruled that the admissions tax did not deny equal protection or due process under the federal and state constitutions.

The plaintiffs on appeal assert that the admissions tax is an illegal variance from the method approved by the voters to retire the bonds, that the tax violates equal protection guarantees, and that it deprives ticket purchasers of due process of law. The defendants on cross-appeal maintain that: (1) the plaintiff Friends of Chamber Music lacks standing to challenge the tax; (2) the action should not have been certified as a class action or individual notice to all class members should have been required; and (3) recovery of taxes paid should be limited to those taxpayers who have exhausted their administrative remedies if the district court judgment is reversed. We first address the cross-appellant's questions of standing and class certification.

I.

Denver asserts that the plaintiff Friends of Chamber Music lacks standing as a col-

---

**4.** At the time of the court's order, at least 124 persons or entities had been identified as vendors.

**5.** On May 10, 1979, at the hearing on the class certification and notice, major vendors testified that they had the names and addresses of approximately 20,000 season ticket holders.

**6.** The court observed that members of the ticket purchaser class numbered in the tens of thousands.

**7.** A substantial portion of the record in this case consists of legal arguments concerning the extent of the notice required and testimony about efforts to comply with the notice requirements. On March 8, 1982, Denver petitioned this court for a writ of prohibition or mandamus under

C.A.R. 21 directed to the district court and the plaintiffs to show cause why the plaintiffs should not be required before trial to provide notice directly to season ticket holders who could be identified with reasonable effort. *City and County of Denver v. The District Court of the Second Judicial District*, 82SA102. Denver alleged that only one vendor was willing to cooperate in placing the notices in its regular mailing. Nevertheless, a different district court judge than the one who certified the class and fashioned the notice requirement set the case for trial on April 19, 1982, despite the lack of notice to individual season ticket holders. We denied Denver's petition, and the class action was tried to the district court on April 19.

lector of the admissions tax to challenge the validity and constitutionality of the tax. Although the district court did not rule directly on the standing question, we address it at the outset.

■ As we have said repeatedly, "the question of standing is really an inquiry into 'whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.' *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)." *State Board for Community Colleges v. Olson*, 687 P.2d 429, 434 (Colo.1984). Resolution of standing involves (1) whether the plaintiff has suffered actual injury from the challenged governmental action; and (2) whether the injury is to a legally protected or cognizable interest. *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977); *accord, e.g., State Board for Community Colleges v. Olson*, 687 P.2d at 434; *Conrad v. City and County of Denver*, 656 P.2d 662 (Colo.1983); *Marco Lounge, Inc. v. City of Federal Heights*, 625 P.2d 982 (Colo.1981); *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, 620 P.2d 1051 (Colo.1980).

■ In determining whether standing exists, a court must accept as true all averments of material fact in a complaint. *State Board for Community Colleges v. Olson*, 687 P.2d at 434. If a complaint, along with any other evidence that the court in its discretion allows the plaintiff to submit, fails to establish any actual harm to the plaintiff, then the court must dismiss the case. *Id.* at 435. If the plaintiff meets this first requirement, the court must address whether the injury is to a legal interest that entitles the plaintiff to judicial redress. *Id.* Resolution of the second part of the test is a normative judgment that the injury is or is not actionable; in effect, a court holds either that the plaintiff has stated a claim for relief by demonstrating the existence of a legal right or interest that arguably has been violated by the action of the defendant, or that the plaintiff has failed to state a claim upon which

relief can be granted because whatever injury the plaintiff might have sustained was not an injury to a legally protected right or interest. *Id.; Conrad*, 656 P.2d at 668; *Cloverleaf Kennel Club*, 620 P.2d at 1056–57.

■ Here, the only injury alleged by Friends of Chamber Music is that under the ordinance it is required to collect the admissions tax and pay the sum collected to Denver without compensation for the expenses of collection. We need not determine whether this allegation is sufficient to meet the first part of the test, an actual injury, because we conclude that the injury alleged is not to a legally protected right or interest.

Friends of Chamber Music asserts that the admissions tax deprives a vendor of property without due process of law because the vendor does not receive compensation for the expense it incurs in collecting the tax. This court held fifty years ago that the collector of taxes does not have standing to protest the validity of the taxing statute because the collector is not injured by the statute. *Wade v. State*, 97 Colo. 52, 47 P.2d 412 (1935). Since that time, however, we have held that a court first should look to the language of the statute in determining who has standing to challenge it. *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, 620 P.2d at 1058; *see Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972).

The ordinance imposing the admissions tax contains specific provisions regarding who has standing to challenge tax assessment. It allows any aggrieved "taxpayer" to petition for administrative and court review of the validity of any particular assessment. Denver, Colo., Ordinance No. 590, Series of 1974 (codified at Denver, Colo. Revised Municipal Code § 53–361 to –366 (1982)). A "taxpayer" is defined to include "any person obligated to account to the manager of revenue for taxes collected." *Id.* (codified at § 53–345(6)). Therefore, the city council specifically granted standing to challenge particular assess-

ments under the ordinance to vendors like Friends of Chamber Music. Friends of Chamber Music did not utilize the procedure for challenging assessments, a hearing before the manager of the Department of Revenue,[8] because the organization was not challenging the amount of the assessment; rather, Friends of Chamber Music questioned the validity of the ordinance under which assessments were made and filed a declaratory judgment action directly in district court. The statutory grant of standing in challenges to assessments therefore does not determine the standing question in this case.

The allegations of Friends of Chamber Music here are not sufficient to establish a legally protected interest. Although the district court did not directly address the standing of Friends of Chamber Music, the court, relying on *City and County of Denver v. Duffy Storage and Moving Co.,* 168 Colo. 91, 450 P.2d 339, *appeal dismissed,* 396 U.S. 2, 90 S.Ct. 23, 24 L.Ed.2d 1 (1969), ruled that there was no merit to the vendor's assertion that the admissions tax deprived it of property without due process of law because it was not reimbursed for its tax collection expenses. In *Duffy Storage and Moving Co.,* this court held that no constitutional violation occurred when an employer was required to withhold from employees and return to the city, without reimbursement for the costs of withholding, a two-dollar tax imposed by the city on all persons employed within city limits. 450 P.2d at 345. *Duffy Storage and Moving Co.* precludes the relief sought by Friends of Chamber Music. Thus, the ruling of the district court was the equivalent of a holding that the plaintiff had failed to state a claim upon which relief could be granted. Therefore, the injury alleged by Friends of Chamber Music was not to a legally protected right, and Friends of Chamber Music does not have standing to challenge the admissions tax.[9] Denver did not claim that the taxpayer-plaintiffs lack standing, and we proceed to address the issues that they raise.[10]

## II.

Denver next contends that the district court should not have certified this action as a class action, or that the court should have required notice to individual taxpayers in accordance with C.R.C.P. 23(c)(2). Denver claims that the class should not have been certified because the plaintiffs made no allegations of fact beyond mere conclusory statements that the class satisfied the requirements of C.R.C.P. 23(a). *See Levine v. Empire Savings & Loan Association,* 197 Colo. 293, 592 P.2d 410 (1979). Denver further suggests that the taxpayer representative plaintiffs have demonstrated their inadequacy as representatives by failing to appeal a district court ruling. Neither of these allegations has any foundation in fact, as the plain-

---

8. *See* Denver, Colo. Revised Municipal Code § 53–361 (1982) and C.R.C.P. 106(a)(4).

9. *Cf. Denver Center for the Performing Arts v. Briggs,* 696 P.2d 299 (Colo.1985), where the plaintiff alleged actual injury from a tax bill of more than $100,000 and potential future losses in patronage from an increase in ticket prices or lost revenue from lower ticket prices to accommodate the admissions tax without raising the price of tickets. In the instant case, the record indicates that Friends of Chamber Music sold out Phipps Auditorium for its presentations so it was unable to allege a loss of patronage because of the imposition of the admissions tax. In addition, in 1981, Friends of Chamber Music moved its concerts to George Washington High School, which is not a city-owned facility, and the concerts were no longer subject to the admissions tax.

10. Denver maintains that the taxpayer-plaintiffs lack standing to recover taxes already paid under the admissions tax ordinance because they did not exhaust their administrative remedies for challenging individual tax assessments before bringing this lawsuit. Denver does not assert that the failure to exhaust administrative remedies prohibits the taxpayers from challenging the validity of the tax and requesting a declaratory judgment regarding its constitutionality. Since we determine that the admissions tax is constitutional, we need not reach the question of whether the taxpayer-plaintiffs would have to exhaust their administrative remedies before requesting reimbursement for the admissions tax they had paid.

tiffs' motion and brief supporting the class certification do contain adequate allegations of fact to fulfill the requirements of C.R.C.P. 23(a) and (b)(3), and the taxpayer representatives have remained named appellants throughout the course of this appeal.[11]

■ The decision of whether to certify a class action lies within the discretion of the trial court and will not be disturbed unless the decision is clearly erroneous and an abuse of discretion. *Mendoza v. United States*, 623 F.2d 1338, 1349 (9th Cir.1980), *cert. denied sub nom. Sanchez v. Tucson Unified School District No. 1*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981); *Brito v. Zia Co.*, 478 F.2d 1200, 1204 (10th Cir.1973); *Borwick v. Bober*, 34 Colo.App. 423, 428, 529 P.2d 1351, 1354 (1974). We need not review the validity of the certification of the class in this case because we conclude that notice to the members of the taxpayer class was inadequate, resulting in class decertification.[12]

■ C.R.C.P. 23(c)(2) requires that, for classes certified under 23(b)(3), "the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." This rule is identical to the corresponding federal rule, and our interpretation of the rule is informed by the federal courts' interpretation of the federal provision. The "best notice practicable" may not include personal notice to all members of the class. *In re Four Seasons Securities Law Litigation*, 63 F.R.D. 422, 430 (W.D.Okla.), *supplemented*, 64 F.R.D. 325 (W.D.Okla.1974), *aff'd* 525 F.2d 500 (10th Cir.1975). Constructive notice by publication may supplement notice to identifiable class members, but such notice "can comport with due process only if there is a maximum opportunity for notice to the absentee class member ...." *Greenfield v. Villager Industries, Inc.*, 483 F.2d 824, 831 (3d Cir.1973); *In re Nissan Motor Corporation Antitrust Litigation*, 552 F.2d 1088, 1097 (5th Cir.1977); *see Berland v. Mack*, 48 F.R.D. 121 (S.D.N.Y.1969). The class representative plaintiffs may be required to search through records accessible to the court in order to find names and addresses of class members "who can be identified through reasonable effort." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); *Eisen v. Carlisle & Jacquelin* (*Eisen IV*), 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974); *In re Nissan Litigation*, 552 F.2d at 1099; *Greenfield v. Villager Industries*, 483 F.2d at 832. Such a search may be omitted if the effort required outweighs the likelihood of obtaining the names of class members. *In re Nissan Litigation*, 552 F.2d at 1099.

■ Most of the federal cases interpreting the "reasonable effort" required of plaintiffs to obtain the names of class members have arisen in circumstances in which one party or another owned records from which the names of class members could be culled. This case presents a different situation because the only manner suggested for obtaining the names of individual ticket purchasers is through the records of various ticket vendors. At the hearing held by the district court to determine what notice should be required, representatives of several ticket vendors testified about the accessibility of their records containing the names and addresses of season ticket holders and subscribers. Few of these witnesses, however, had the knowledge or authority to indicate whether the vendors would be willing to release their records for pur-

---

11. On September 13, 1983, we granted the plaintiffs' motion to amend the caption of their designation of parties, motions and briefs, which referred to "Friends of Chamber Music, a Non-Profit Corporation, et al., Plaintiffs-Appellants," to specify "Suzanne W. Joshel and Kevin Markey, for Themselves and All Others Similarly Situated."

12. Since we conclude that Friends of Chamber Music does not have standing to prosecute this action, we need not address the vendor class. We note, however, that all similarly situated vendors were identified by Denver and notified of the pending class action by Friends of Chamber Music.

poses of this litigation, or be willing to include notices of this litigation in their regular mailings to season ticket holders and subscribers. To accommodate the problem, the district court ordered that the notice should be included in mailings to season ticket holders and subscribers "providing that such vendor is willing to cooperate."

The court's order ignored the possibility that plaintiffs could obtain the names and addresses of season ticket holders and subscribers and send separate notices, even if the vendors would not include these notices in regular mailings.[13] If the vendors were not willing to provide their records for the purposes of obtaining this information, the court's order could also have suggested that the plaintiffs should obtain subpoenae duces tecum to require the vendors to provide their records to the court. *See Gold v. Ernst & Ernst*, 574 F.2d 662, 675 (2d Cir. 1978), *modified*, 599 F.2d 1109 (2d Cir. 1979). In addition, the court ordered that the constructive notice was to be published only one time in each of the two major Denver metropolitan newspapers. Although published in the entertainment and sports sections, where the notices most likely would be seen by ticket purchasers, the single publication in each newspaper may have been insufficient constructive notice even to supplement notice to identifiable class members. *See Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."). *See, e.g., Greenfield v. Villager Industries*, 483 F.2d at 830 (notice to national stockholders published once in

Wall Street Journal and Philadelphia Bulletin not adequate); *Mendoza v. United States*, 623 F.2d at 1351 (notice of settlement for class action certified under Rule 23(b)(2) published thirteen times in two metropolitan newspapers in seven day period adequate to supplement other community publicity). *But see Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 622 (D.Colo.1974) (two publications in national edition of Wall Street Journal adequate constructive notice to supplement individual notice given to identifiable members of class); *Contract Buyers League v. F & F Investments*, 48 F.R.D. 7, 15 (N.D.Ill.1969) (publication in Chicago newspapers adequate constructive notice to supplement notice given to identified class members).

In the present situation, in which several other reasonable steps could have been taken to identify and notify individual class members, those members cannot be bound by the judgment of the court under C.R. C.P. 23(c)(2). Therefore, we decertify the ticket purchaser class for purposes of the judgment in this case. We turn next to the issues raised by the named individual taxpayers.

### III.

The taxpayer plaintiffs maintain that the imposition of the admissions tax to contribute to retiring the stadium improvements bonds worked an illegal change in the bond ordinance approved by the voters for several reasons. Because the city charter provides that bonds may not be issued except upon the vote of the electorate, Denver, Colo., Charter § A6.17–1, the plaintiffs assert that funds to repay the bonds legally cannot come from different sources than

---

**13.** The plaintiffs understandably were seeking to avoid several thousand dollars in mailing costs, a preliminary expense sufficient to deter the litigation when the named taxpayers' claim is 10% of an undisclosed amount spent (since the adoption of the admissions tax) for tickets to events in Denver facilities other than Mile High Stadium. However, in *Eisen v. Carlisle & Jacquelin (Eisen IV)*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the United States Supreme Court recognized that requiring class representative plaintiffs to provide individual notice to class members whose names and addresses can be identified through reasonable effort of the pending class action could force an end to a suit as a class action under C.R.C.P. 23(b)(3) because of prohibitively high costs. Nevertheless, the Court ruled that "... individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case .... There is nothing in Rule 23 to suggest that the notice requirements can be tailored to fit the pocketbooks of particular plaintiffs." *Eisen IV*, 417 U.S. at 176, 94 S.Ct. at 2151.

those mentioned in the submission ordinance. Further, they assert that the adoption of the admissions tax acts to amend or repeal the bond ordinance adopted by the electorate violated another section of the city charter which provides that ordinances adopted by the electorate may not be amended or repealed within one year. Denver, Colo., Charter § C2.3–1(5). Finally, the plaintiffs contend that the inconsistency between the admissions tax ordinance and the bond submission ordinance serves to repeal the bond ordinance, in violation of the city charter. Denver, Colo., Charter § A6.17.

Denver's power to issue bonds derives from the state constitution and the city charter. The state constitution specifically provides that Denver "shall have the power to issue bonds upon the vote of the taxpaying electors, at any special or general election, in any amount necessary to carry out any of said powers or purposes, as may by the charter be provided." Colo. Const. art. XX, § 1. This power and the requirement that bond issuance be approved by the electorate is reiterated in the city charter. Denver, Colo., Charter § A6.17–1.[14]

 Procedures and requirements for bond elections are further defined in section 31–21–103(1), 12 C.R.S. (1977):

> The election notice shall specify, in addition to the time and places for holding said election, the qualifications for persons to vote on such question, the amount of the indebtedness to be funded, and the amount of funding bonds proposed to be issued and the rate of interest they shall bear.

This provision does not limit the information to be given in the election announcement, for it does not even require that the election announcement indicate the use to which the proceeds from the bonds will be put. However, it is well established in Colorado that the proceeds from bonds may be used only for the purposes that the electorate has approved. *City and County of Denver v. Currigan,* 147 Colo. 125, 132, 362 P.2d 1060, 1064 (1961); *McNichols v. City and County of Denver,* 120 Colo. 380, 384–85, 209 P.2d 910, 912–13 (1949).

The plaintiffs rely on the cases requiring the proceeds from bonds to be used for the purposes approved by the electorate and on cases from other jurisdictions holding that the terms of retirement of bonds (such as interest rates and date of maturity) must comport with the terms approved by the electorate. The plaintiffs contend that these decisions lead to the conclusion that the interest and principal on the bonds must be paid out of the funds mentioned in the questions submitted to the voters. Some of the cases are inapposite because the decisions have disapproved changes in terms of the bonds that increased the indebtedness of the municipality or extended municipal repayment commitments. *See, e.g., Kenton County v. Ankenbauer,* 293 S.W.2d 873 (Ky.1956) (county could not change interest and amortization schedules of bonds after those questions submitted to voters); *Skinner v. City of Santa Rosa,* 107 Cal. 464, 40 P. 742 (1895) (city could not issue bonds payable semi-annually instead of annually as approved by voters). The cases involving proceeds from bonds diverted to other purposes also are irrelevant to the present situation because no claim has been made that the bonds issued were not used for the purposes approved by the voters.

The few cases that address the question of whether additional funds may be used to supplement voter approved income sources for bond retirement persuade us that the use of an admissions tax rather than an ad valorem tax to repay the stadium improvement bonds is permissible. In *Brodhead v. City and County of Denver,* 126 Colo. 119, 247 P.2d 140 (1952), this court held that Denver did not have to mortgage the facili-

---

**14.** Section A6.17–1 of the city charter provides: No loan shall be created nor bonds issued unless the question of creating the same and issuing the bonds therefor shall be submitted to the vote of the qualified electors of the City and County of Denver and a majority of those voting upon the question by ballot shall vote in favor of creating such debt and issuing such bonds.

ties constructed out of the funds from a bond issue, although the voters had approved a mortgage of those facilities. Because the decision not to mortgage the facilities was of greater benefit to the city than the financing approved by the voters, Denver was not compelled to follow the course approved in the election. The present case is similar; the use here of another source of funds to retire the stadium improvement bonds benefits the city and the voters who had approved the assessment of ad valorem property taxes to retire the bonds.[15]

The Nevada Supreme Court, in *State ex rel. General Obligation Bond Commission v. Koontz*, 84 Nev. 130, 437 P.2d 72 (1968), concluded that the electorate's specification of ad valorem taxes to retire bonds did not preclude the use of other sources for repayment. 437 P.2d at 77. The Nevada court's determination that an affirmative provision for the source of repayment of bonds should not be interpreted to imply a negative exclusion of other sources of repayment is persuasive. The use of funds from other sources is not forbidden by taxpayers who approve the assessment of ad valorem taxes for bond repayment. *See also State ex rel. Utah Savings & Trust Co. v. Salt Lake City*, 35 Utah 25, 99 P. 255 (1908) (when sources of income for repayment of bonds are specified by statute, vote of electorate does not restrict the manner of repayment).

In the present case, the stadium refunding and improvement bonds were issued as approved by the voters. They were general obligation bonds of the city, and as such were payable by resort to ad valorem property taxes. It was appropriate that the voters should be informed of the city's obligation when voting on the bond issue. The admissions tax was a separate tax that the city council enacted by ordinance before the election, which was effective as a source of funds for the city whether or not the electorate adopted the bond ordinance. Denver's use of the funds from the admissions tax obviated the need for higher property taxes to repay the bonds and was an advantage for persons subject to property taxation in Denver.[16] Voter approval of property tax assessments to retire the bonds did not mandate additional ad valorem taxes. We hold that use of the admissions tax proceeds to retire the stadium bonds does not work an illegal change in the bond ordinance approved by the voters, nor does it amend or repeal the submission ordinance or bond issuance ordinances.

## IV.

The taxpayer-plaintiffs also assert that the admissions tax violates the equal protection and due process guarantees embodied in the fourteenth amendment of the United States Constitution and article II, section 25 of the Colorado Constitution. The plaintiffs specifically argue that the admissions tax deprives those who attend

---

15. The present case is also similar to *Berman v. City and County of Denver*, 156 Colo. 538, 400 P.2d 434 (1965), in which this court held that the city could use the proceeds from sales and use taxes to retire municipal bonds, although the city charter at that time provided only for the use of property taxes to retire bonds. In *Berman*, the submission ordinance stated that sales and use taxes would be used to retire the bonds, but the question actually submitted to the voters provided only that property taxes could be used. Denver, Colo., Ordinance No. 130, Series of 1964. The issue of whether it was permissible to use funds other than property taxes to retire the bonds when the question approved by the voters mentioned only property taxes was not raised, and therefore was not addressed by the court.

16. The evidence before the district court indicated that the admissions tax was not the sole source of funds for retiring the stadium improvement bonds and that admissions tax revenues might be used for purposes other than retiring those bonds. The deposition of Denver's deputy treasurer showed that admissions tax revenues regularly were transferred into the city's sinking funds and bond interest and indebtedness fund, from which all bond obligations of the city are paid. Once transferred into these funds, revenues are commingled. As the district court found, "Because of the peaks and valleys of the cash flow from all the sources of revenue, it is impossible to determine at any one time which of all the taxes deposited in the fund can be attributed to the debt service of the stadium bonds."

events at city-owned facilities of the equal protection of the laws because the tax is imposed solely on events at city-owned facilities and not on equivalent entertainment programs at facilities that are privately owned or owned by other governmental entities.

■■■ As the classification between those who attend events at city facilities and those who attend events at facilities owned by others is not a constitutionally suspect classification, equal protection is guaranteed if there is a rational basis for the classification imposed. *See Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). This standard has often been applied to classifications for taxation purposes in Colorado: "the requirements of equal protection are satisfied if (1) the legislative classification bears some reasonable relation to a legitimate state interest, and (2) all persons within a class are treated in the same manner." *First National Bank of Denver v. Board of County Commissioners*, 189 Colo. 128, 132, 538 P.2d 427, 429 (1975); *Western Electric Co. v. Weed*, 185 Colo. 340, 353–54, 524 P.2d 1369, 1376 (1974). "In taxation, even more than in other fields, the legislature has greater freedom to classify." *American Mobilehome Association, Inc. v. Dolan*, 191 Colo. 433, 437, 553 P.2d 758, 762 (1976). The federal constitution grants states broad discretion in establishing classifications for taxation. *Lehnhausen v. Lakeshore Auto Parts Co.*, 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1973). "[P]ossible differences in tax burdens not shown to be substantial or which are based on discriminations not shown to be arbitrary and capricious ... do not fall within constitutional prohibitions." *Lawrence v. State Tax Commission*, 286 U.S. 276, 284, 52 S.Ct. 556, 559, 76 L.Ed. 1102 (1932).

■■■ Denver sets forth a rational basis for limiting imposition of the admissions tax to those who attend events at city facilities. The tax is intended primarily to pay for improvements at Mile High Stadium; a secondary purpose is to improve other city facilities. Therefore, the city council reasonably limited the burden of the tax to those who attend events at city facilities.

■■■ The appellants next maintain that the admissions tax violates due process [17] by imposing a burden on all those who attend events at city facilities but benefiting only those who attend events at Mile High Stadium. Although the purpose stated for the admissions tax includes improvements to all city facilities, its use thus far primarily has benefited Mile High Stadium because the proceeds have been transferred into Denver's bond debt service funds. Therefore, we assume that Mile High Stadium and its patrons have enjoyed a disproportionate benefit from the revenues accrued from the tax. However, this disproportionate benefit does not necessarily infringe upon due process.

As long as the proceeds are devoted to public and governmental purposes, otherwise valid taxes may be imposed upon a group of people who will not necessarily benefit from the funds collected. *Millis v. Board of County Commissioners*, 626 P.2d 652 (Colo.1981); *Hughes v. State*, 97 Colo. 279, 286–87, 49 P.2d 1009, 1012 (1935). The United States Supreme Court set forth the reasons that such a tax is not an unconstitutional deprivation of property in *Carmichael v. Southern Coal and Coke Co.*:

> A tax is not an assessment of benefits. It is ... a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes.

---

**17.** The plaintiffs make the same argument as a claim that the admissions tax violates equal protection. The argument customarily is addressed under a deprivation-of-property-without-due-process-of-law rationale, and we choose to subsume the plaintiffs' equal protection claim within our due process discussion.

301 U.S. 495, 522, 57 S.Ct. 868, 878, 81 L.Ed. 1245 (1937). The Court pointed out that "[n]othing is more familiar" than taxes that impose a burden on a class that may not benefit from them. Therefore, the potentially disproportionate burden on patrons of facilities other than Mile High Stadium does not violate the state or federal due process clauses.

None of the arguments raised by the plaintiffs invalidates the admissions tax. It is an appropriate means of supplementing the revenues necessary to retire the stadium improvement bonds, and it does not conflict with the state and federal guarantees of equal protection and due process of law.

The judgment of the district court is affirmed in part and reversed in part.

KIRSHBAUM, J., does not participate.